## NELMS & BLUM CO. v. FINK.

(Division B.   Jan. 12, 1930.)

[131 So. 817.   No. 29117.]

Humphreys & Anderson, of Greenville, for appellant.

W. A. Percy and Percy, Strauss & Kellner, all of Greenville, for appellee.

Argued orally by **W. Y. Humphreys**, for appellant, and Will **A. Percy** and **Ernest Kellner**, for appellee.

**Ethridge, P. J.**, delivered the opinion of the court.

The appellee was plaintiff in the court below, and the appellants were defendants there. The appellee brought suit for personal injuries sustained while employed by the defendants in their store at Greenville, Mississippi.

It appears that the defendants had a contrivance which held wrapping paper and which sat upon a counter or desk in a vertical position and was not attached to the counter by screws or nails or anything to hold it securely in position. The frame of this appliance was something like thirty-six inches high. At the desk or counter where this appliance was situated the defendants had a wrapping clerk who wrapped packages for the clerks making sales, and the salesmen were required to make out a ticket or memorandum of sale at the desk where the packages were wrapped. While Mrs. Fink was making

a memorandum in a stooping position at the desk, the wrapping clerk undertook to tear from the appliance paper with which to wrap the package Mrs. Fink had sold. The roll of paper placed on the appliance, when full, weighed about thirty-six pounds, and the exact amount then upon the appliance was not known with precision, but was something more than half the full paper. The base of this appliance which sat upon the counter at its longest point was about twelve inches and its width about nine inches. When the wrapping clerk jerked the paper, the appliance toppled and fell against Mrs. Fink, striking her on the head.

The plaintiff's evidence, and other evidence in support of hers, tended to show that the injury inflicted resulted in much suffering and probably in permanent injury to some of the nerves and especially one to the eye. She went to a doctor after recovering from the temporary stunning, or as she testified "unconsciousness," and the doctor advised her not to return to work but to go to bed and remain in bed for some time. It appears that the doctor thought there was some brain injury, either concussion or contusion, and in such case it was necessary to remain in bed or in a hospital for not less than four weeks to prevent permanent injury. It also appears that the plaintiff had a permanent dilation of the pupil of one eye, which the medical testimony on her behalf tended to show could only be caused by a permanent injury of one of the nerves leading to the eye. After a second examination some hours after the first examination, the doctor decided Mrs. Fink should go to a hospital for attention, and she did go and remain there for quite a time. While there it was discovered that she had a diseased appendix, and an operation was performed on her for that, but the relief from her suffering appears to have been only for a few hours. The physicians attending her, deeming that she might be suffering from an injury to the brain caused by the blow on the head, decided on

a spinal puncture to relieve or drain some of the fluid that such a blow might have caused, and the first puncture giving a temporary relief, but not a permanent relief, the second and third were made, but they do not seem to have given very much relief. One of the physicians attending her then decided that possibly an air treatment might relieve her or benefit her, but, as he had never performed that operation and had never seen it performed, he was unwilling to do so unless Mrs. Fink and her husband would sign an instrument releasing him from any liability for the consequence of such operation, and he asked them to take time and think it over. Two of the members of the medical firm had advised Mrs. Fink against this operation, and they decided that in view of the fact the doctor desired a release he did not have much confidence in it, and that it might be dangerous, and they declined to have the operation performed.

The injuries to Mrs. Fink occurred in January, on the 12th day of that month, and the trial took place in June beginning on the 20th of that month. Mrs. Fink's testimony is to the effect that she continuously suffered headaches and other aches, and had lost weight and was unable to do work as she had formerly done. She was supported in her testimony by other testimony in like effect. The physician who treated her after her injury thought that her complaints were out of proportion to the injury she had received and became suspicious of her good motives and the extent of her injuries, thinking possibly she had a lawsuit in view, attributing this condition to what is called litigation neurosis which appears to be a disturbance of the brain and a magnifying, in the patient's mind, of the injuries, and a desire to be compensated for them. There was testimony for the defendants tending to contradict the plaintiff's evidence and tending to show that plaintiff had, prior to the injury, complained of headaches and other complaints, and had had medical attention for lumbago and for flu and for some sinus affection.

There is much testimony for the defendants in opposition to the plaintiff's theory of the case; and it was, on all the evidence, a question for the jury to say whether or not her injury existed and to what extent it did exist.

While one of the physicians for the plaintiff was on the stand, he was asked as to the tests made of Mrs. Fink and the fluid drawn from her spinal column and, among other things, was asked if the Wasserman test was made and what the result was. On redirect examination one of the attorneys for the plaintiff examined the doctor as follows:

"Q. Dr. Archer, Mr. Anderson has made you some valuable suggestions which probably you haven't thought of before. He suggested that this lady was suffering from sinus trouble, said she was a neurotic and a syphilitic and suggested that she was malingering—

"Mr. Anderson: We object to that.

"After being informed by counsel of these various possibilities, do you now have any reason to change your original statement made on direct examination that the injury to this lady came from the injury sustained?

"Mr. Anderson: We object to that.

"Court: Overruled. Exception by defendant.

"Q. After you have been cross-examined by Mr. Anderson do you see any reason to change your original statement of the condition of this lady? A. No, sir."

This question and answer and ruling constitute one of the principal assignments of error. It will be noted that in the first part of the question it is stated that one of the counsel for the defendants had suggested that plaintiff was suffering from sinus trouble and had said that she was a neurotic and a syphilitic, and suggested that she was malingering, whereupon counsel for the plaintiff objected. After that objection, there being no ruling shown, counsel continued, apparently intending to change the form of his question, and this was then objected to

and the court overruled the objection, and exception was taken. It does not appear that the whole question was intended to be embraced in the ruling on the last objec- tion. Counsel seem to have realized that the first part of the question was improperly asked, but at any rate there was no ruling upon it. Of course, it was improper to state in the question that counsel had said that the plain- tiff was a neurotic and a syphilitic. It is true the Wasser- man test is a method of determining whether there are syphilitic symptoms or conditions in the blood of the patient, and it is possibly generally known that this is what the test is used or made for. While it was error to ask the question in the form it was asked, we do not think that it is sufficiently important to justify the setting aside of the verdict and the granting of a new trial. The jury are supposed to be, in fact they are required to be by statute, men of intelligence, sound judgment, and good character, and they usually know how to evaluate ques- tions and answers propounded by the respective at- torneys in the trial of a lawsuit; they know that counsel are striving to secure positions of advantage throughout the trial favorable to the side they represent; they usual- ly hear the evidence with attention and remember it with perhaps as much accuracy as do the lawyers. This is not an error that should reverse a case. Many errors will creep into the trial of a hotly contested lawsuit. We do not believe the judgment should be reversed for this error.

We have examined the instructions and do not find any reversible error in them. Instructions are practical things and do not require verbal refinement or rhetorical precision. They are given to practical men as practical guides in affairs constituting lawsuits, and if the sub- stance of law is fairly given as applied to the facts, we will not reverse, even though there may be technical errors or imperfect phraseology.

Exception was taken by the defendants to arguments made by attorneys for the plaintiff. It appears that one of counsel for plaintiff, in opening the argument or during the opening argument, stated: "Not only have there been throughout the trial insinuations that the plaintiff was faking and trying to get money, but there have been insinuations against the character of the plaintiff throughout the whole trial." Whereupon counsel for the defendants objected, and thereupon the court said: "With reference to the statement relative to the plaintiff's character, that objection is sustained. . . . The motion for a mistrial is overruled." To which there was exception. In view of the positions of defendants in the litigation in reference to their proof and theories of the case, we cannot see that this statement was objectionable, especially as the statement attacking her character was excluded by the court. In the course of the closing argument, an attorney for the plaintiff said: "It is a rule of the sea in case of a sinking vessel that women and children shall be first, but this defendant, through counsel, by innuendo and insinuation, has throughout the entire trial reflected upon the character of this wife and mother and has been striking at her like snakes." Whereupon objection was made, and it was moved the court instruct the jury to disregard the same; whereupon the court said: "Stay in the record, Mr. Percy." Again it is shown that during the closing argument the counsel for the plaintiff said: "Mr. Davis, an eye, ear and nose specialist who never examined Mrs. Fink, threw out the thing he called litigation neurosis. So far as the record shows this is the first law suit she has ever had and both the United States Fidelity and Guaranty Co., and Nelms and Blum Co., have enough money to have scoured the country to find out everything about her past, and you may rest assured that if there had been anything to find out, it would have been put into the case; they could have brought a specialist down from Memphis." Whereupon counsel for the

defendants objected to the argument, but there was no ruling by the court and nothing in the record to show that a ruling was insisted upon. The reference to the surety company, and the fact that the defendants and surety company could have found out anything with reference to the plaintiff's past, is based upon a statement by the plaintiff that at the time of the injury the defendants had promised to pay her bills, and that they said they had insurance to cover all this, and that she wanted her bills paid and her health back. There was no objection to this testimony. There was objection to plaintiff's argument: "Did this lady suffer? Think how you men would feel if a wife, a sister, or one dear to you, were to have to go through the suffering she has undergone With that I have done." Whereupon the court said to the jury: "Retire gentlemen and consider of your verdict." Whereupon counsel for the defendant said: "Your Honor, before the jury retires I ask that the jury be instructed to disregard the last argument of counsel. It is improper to argue on the question of damages the amount a juror would want under the same circumstances." Whereupon the court said: "Yes, sir. Disregard that argument, gentlemen of the jury."

The trial took place, as stated, on the 20th of June, and the jury's verdict was rendered on that day. The special bill of exceptions was filed and signed on the 1st day of July, the court being then in session and the term not having ended, although the verdict had been rendered and the judgment entered.

It is always a difficult matter, as well as a delicate one, to determine whether there has been an abuse of the privilege of advocacy in the argument of the causes, except in few cases where it is so palpably evident that the case has been prejudiced by a statement of facts not in evidence or by gross invectives and abuse, and we do not have the advantage that the trial judge has of hearing the argument as a whole. The trial judge has a peculiar

and distinct advantage of the judges of this court in judging upon such questions, because he is not only familiar with the evidence and the atmosphere of the case, as it may be called, but he has heard the entire argument and knows the setting that the language complained of has in connection with the argument on both sides of a case. Very often by a course of argument counsel on one side of an argument provoke a course of argument which would not be made without being provoked, and it is, of course, easy for the trial judge to see whether this is true or not. He has a duty to perform to see that there is no such abuse of the parties in argument as would make injustice prevail in the case. It is a difficult and a delicate duty for even the trial judge to undertake to interfere with the argument until it has clearly and conclusively exceeded the legitimate field of argument. Counsel necessarily has and must have to serve his function and office, a wide field of discretion. He may comment upon any facts introduced in evidence. He may draw whatever deductions seem to him proper from these facts, so long as he does not use violent and abusive language, and even in many cases invectives may be justified and even called for, as eloquently pointed out by Chief Justice WHITFIELD in Gray v. State, 90 Miss. 235, 43 So. 289. Counsel is not required to be logical in argument; he is not required to draw sound conclusions, or to have a perfect argument measured by logical and rhetorical rules; his function is to draw conclusions and inferences from evidence on behalf of his client in whatever way he deems proper, so long as he does not become abusive and go outside the confines of the record. Usually when the argument is considered as a whole it is found consistent and logical and frequently eloquent. Some of the greatest speeches in our history have been made within the courthouse. As has been said, the court cannot control the substance and phraseology of counsel's argument; there is nothing to authorize the court to in-

terfere until there is either abuse, unjustified denunciation, or a statement of fact not shown in evidence.

Counsel may draw upon literature, history, science, religion, and philosophy for material for his argument. He may navigate all rivers of modern literature or sail the seas of ancient learning; he may explore all the shores of thought and experience; he may, if he will, take the wings of the morning and fly not only to the uttermost parts of the sea but to the uttermost limits of space in search of illustrations, similes, and metaphors to adorn his argument. He may reach the uttermost heights of attainable eloquence, soar into the empyrean heights where his shadow may fall on the loftiest mountain top, as the eagle in its loftiest flight. He may borrow from every source, modern and ancient, such materials as he needs for his argument. He may clothe the common occurrences of life in the habiliments of poetry and give to airy nothings a habitation and a name. He may weave of words a rhetorical bouquet that enchants the ear and mesmerizes the mind. He may make the learning of the ages the servant of his tongue. His argument may be as profound as logic and learning can make them. He may give wing to his wit and play to his imagination so long as he does not imagine fact not in evidence, which the court does not take judicial knowledge of, or does not go out of the record for the facts not in evidence. As to the facts in evidence, he may array them in such figures and form and clothe them with such ideas and conclusions as he can conjure up in his mind for the best interest of his cause. He cannot, however, state facts which are not in evidence, and which the court does not judicially know, in aid of his evidence. Neither can he appeal to the prejudices of men by injecting prejudices not contained in some source of the evidence.

As stated above, the special bill of exceptions was not presented and signed until the trial had ended. If the objection had been sustained counsel should have some

chance ordinarily to reshape his argument so as to present his thought in its most effective form, therefore it would be a rare case which we would reverse where a bill of exceptions was not presented to the trial judge prior to the rendition of the verdict, or prior to the close of the argument. There should at least be a verbal statement of the argument, and the objection thereto, before the argument is ended, and a ruling should be insisted upon.

We find no reversible error, and the judgment is affirmed.

Affirmed.