595 So.2d 1299 (1992)
Tommy WILLIAMS
v.
STATE of Mississippi.
No. 89-KA-0139.
Supreme Court of Mississippi.
February 26, 1992.
Rehearing Denied April 1, 1992.
*1300 Jackson M. Brown, Paula E. Drungole, Starkville, for appellant.
Mike C. Moore, Atty. Gen., Jackson, for appellee.
Before ROY NOBLE LEE, C.J., and ROBERTSON and McRAE, JJ.
ROBERTSON, Justice, for the court:

I.
This prosecution for the felonious receipt of a stolen log skidder rests upon substantial and convincing circumstantial evidence. The receiver tried to hide his involvement but found this as hard as hiding the log skidder had been, and the jury found him guilty. Notwithstanding, the receiver appeals and presents a variety of procedural and evidentiary questions. We have considered all of these with care and affirm.

II.
In 1987, James W. Sessums Timber Company, Inc., was engaged in a logging operation in Madison County, near the Leake County line, and employed two pieces of heavy equipment known as skidders which were used to drag logs out of the woods. The first  the one we are principally concerned with  was a D-4H custom skidder operated on quad tracks. Sessums had purchased it for $111,000.00. The second was a rubber tired skidder, a 518. Together, these two pieces of machinery were worth close to a quarter of a million dollars. It seems Sessums' crew left the two skidders at the wooded job site on Thursday night, June 4, 1987. On Friday it rained, and the crew did not work. When they returned to work on the following Monday morning, the skidders were no-where to be found. Sessums next saw the skidders in the custody of the Sheriff of Oktibbeha County and reclaimed possession on June 22, 1987.
*1301 Kenneth Leach lives in Carthage, Mississippi, and earns his keep hauling logs. In the late Spring of 1987, David Breazeale,[1] a life-time acquaintance, approached Leach and asked his help in stealing some heavy equipment. Breazeale told Leach about the skidders, "and where they was at and pick them up and take them somewhere." Breazeale offered Leach $1,000.00 per piece of equipment for his pilferage services. Leach understood that he was to take the skidders up Highway 25 above Louisville, where someone would meet him.
Late on the designated Thursday evening, Leach and Breazeale met and fetched Breazeale's lowboy, on which they planned to move the skidders. They went to the job site in Madison County, loaded the skidders, and hit the highway heading northeast. A tire soon blew out and then a second tire burst not far from Louisville near where Highway 25 intersects with Highways 14 and 15. Apparently the weight of the skidders was more than the lowboy could handle. Leach was able to drag the disabled lowboy trailer carrying the skidders a while further but finally was forced off the road.
Soon thereafter, Defendant Tommy Williams arrived on the scene with Jerry Mann and Andy Hillhouse. Mann got into the truck with Leach, and they dragged the loaded lowboy one to two miles from the Sturgis Road to "where Highway 25 goes back in." They unloaded the 518, the rubber tired skidder, and Mann drove it away with Williams following in the car.
Meanwhile, Breazeale had gone for help, and sometime after 1:00 a.m., returned with Billy Coffee, who worked for Edwards Tire Service in Kosciusko. When Coffee and Breazeale arrived, Mann and Leach were there, along with two other men. Coffee soon saw that the lowboy could not be fixed on the spot because the axle had been damaged. An attempt was made to chain it to the frame, but, when the tracked skidder was reloaded, the chains broke. Breazeale drove the truck, "turned around and went back down to the Sturgis Road and went over into the woods three or four miles somewhere or another and unloaded it." Breazeale then instructed Leach to take the disabled lowboy in for repairs, and all left the premises.
The following Sunday, Leach returned with the repaired lowboy and, at about 12:30 or 1:00 a.m., he and Breazeale loaded the D-4H onto the lowboy. Leach, driving the truck, then followed Breazeale to a camp site in Oktibbeha County, which was owned by Williams' sister. When Leach arrived, Williams, Breazeale and Hillhouse were there. They unloaded the D-4H and drove it down past the camp house and concealed it in some nearby woods.
The most substantial evidence of Williams' guilt was supplied by Jerry Mann, who lives in Maben and drives skidders. Mann once worked for Breazeale. Around midnight on June 4, 1987, Williams and another contacted Mann and asked him to help unload a skidder. Williams had told Mann that he was expecting his son, Breazeale, to bring him some skidders that day. The three  Williams, Mann and Hillhouse  drove in the dead of night down to Louisville, where they found the lowboy broken down. Mann and David Dewberry ultimately bought the rubber tired skidder from Williams. Mann never acknowledged he knew the full extent of Williams' involvement, but admitted Williams had given him instructions after they arrived at the broken down truck loaded with the stolen skidders. Mann says Williams and another man had threatened to kill him if he talked.
Mann had talked anyway, and based on information he had supplied, Emmitt Boozer and Jimmy Edwards, both criminal investigation officers with the Mississippi Highway Patrol, began surveillance operations of the camp house site on June 15, 1987. Mann had led the officers to the camp, and, from that point, they followed tracks made by the skidder when moved to its secluded resting place in a wooded area *1302 apparently owned by Weyerhauser Corporation. Surveilling officers watched the equipment for at least four days. Boozer and Edwards said the property was known in the area as Williams' camp site, a fact confirmed by Oktibbeha County Sheriff Dolph Bryan, although title was officially registered in the name of Williams' sister, Shirley Douglas. Only once during the four day surveillance did Boozer see Williams at the camp site.
On June 19, two individuals, Pat Lewis and Andy Hillhouse, approached the hidden D-4H skidder and tried to move it. The surveilling officers on duty saw this and placed the two under arrest. It developed they had arrived in a vehicle owned by Tommy Williams. This led to the arrest of others, including Williams.
On July 29, 1988, the grand jury of Oktibbeha County returned an indictment charging Williams with receiving stolen property, to-wit, the D-4H tracked skidder. Miss. Code Ann. § 97-17-69 (1972). The rubber tired skidder was not named in the indictment. In due course, the case was called for trial and on January 26, 1989, the jury found Williams guilty as charged. The Circuit Court sentenced Williams to serve five years in the custody of the Mississippi Department of Corrections and ordered that he pay a fine of $5,000.00.
Williams now appeals his conviction and sentence to this Court.

III.

A.
Williams argues that the Circuit Court erred when it denied his motion for judgment of acquittal notwithstanding the verdict. His substantive point, of course, is the familiar charge that the evidence was legally insufficient that the jury's verdict may stand. See Jackson v. Virginia, 443 U.S. 307, 313-14, 99 S.Ct. 2781, 2786, 61 L.Ed.2d 560, 569-70 (1979); White v. State, 532 So.2d 1207, 1219-20 (Miss. 1988). When considering such a point on appeal, our scope of review is as limited as it is familiar. See, e.g., McFee v. State, 511 So.2d 130, 133-34 (Miss. 1987), wherein we said:
We proceed by considering all of the evidence  not just that supporting the case for the prosecution  in the light most consistent with the verdict. We give prosecution the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point in favor of the accused with sufficient force that reasonable men could not have found beyond a reasonable doubt that he was guilty, reversal and discharge are required. On the other hand, if there is in the record substantial evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions, the verdict of guilty is thus placed beyond our authority to disturb. [citations omitted]
We have more recently pursued these views in Heidel v. State, 587 So.2d 835, 838-40 (Miss. 1991); Roberts v. State, 582 So.2d 423, 424-25 (Miss. 1991); McGee v. State, 569 So.2d 1191, 1193-94 (Miss. 1990); and Benson v. State, 551 So.2d 188, 192-93 (Miss. 1989), among others. See particularly, Davis v. State, 586 So.2d 817, 819 (Miss. 1991); Lewis v. State, 573 So.2d 713, 714 (Miss. 1990); Whatley v. State, 490 So.2d 1220, 1222-24 (Miss. 1986); and Thompson v. State, 457 So.2d 953, 954-56 (Miss. 1984), accepting these standards and applying them in the context of today's offense.
We measure the evidence under these standards in the light of court-approved definition of the offense. See Pennock v. State, 550 So.2d 410, 412 fn. 4 (Miss. 1989); Fisher v. State, 481 So.2d 203, 212-13 (Miss. 1985). Instruction S-2[2] reads:

*1303 ... [I]f you find ... that the defendant, Tommy Williams, did on or about June 7, 1987, unlawfully, wilfully, and feloniously receive a Caterpillar D4H custom skidder with quad track, having a total value in excess of $100.00, which was the property of James W. Sessums Timber Co., Inc., which had been feloniously taken away from the James Sessums Timber Co., Inc., and that Tommy Williams knew the same to have been so taken at the time he received it, then you shall find the defendant guilty as charged.
The law does not demand proof that the accused took the stolen property into his hands; indeed, it would be tough to take a D-4H skidder into one's hands. "Receive" within the statute contemplates that the accused has performed some act with respect to the property, that he has exercised dominion or control over it, though such need not have been exclusive. See, e.g., Davis v. State, 586 So.2d 817, 820 (Miss. 1991); Lewis v. State, 573 So.2d 713, 714 (Miss. 1990); Church v. State, 317 So.2d 386, 387 (Miss. 1975); Daniel v. State, 212 Miss. 223, 228, 54 So.2d 272, 274 (1951). We know that Williams called Mann in the dead of night and said his help was needed with the skidders near Louisville. Williams came to the scene on Highway 25 where the overladen lowboy had broken down and gave instructions, and, without dispute, Williams was at the camp site in Oktibbeha County when the tracked skidder was delivered, and it matters not that others may have been present and parties to the plot.
Inferential evidence abounds that Williams knew the origins and ownership of the skidder and more than shows his guilty knowledge. Lewis v. State, 573 So.2d at 715; Van v. State, 477 So.2d 1350, 1351 (Miss. 1985); Ellett v. State, 364 So.2d 669, 670 (Miss. 1978). Jerry Mann's testimony that Williams had told him he was expecting his son to bring him some skidders is sufficient unto the day. The evidence suggests as well that Williams may have been accessory before the fact of the theft, but this is no obstacle to the present prosecution. Knowles v. State, 341 So.2d 913, 915-16 (Miss. 1977).
Given the legal definition of the offense, coupled with established limits upon our scope of review of jury verdicts in criminal cases, we think it dispositive of the present issue that the evidence is substantial Williams took each step necessary to offend the law. Fair-minded jurors on this evidence could have found beyond a reasonable doubt that Williams exercised dominion and control over the D-4H skidder such that he has received it, knowing the same to have been stolen. See Lumpkin v. State, 413 So.2d 386, 387 (Miss. 1982). That all pieces of the puzzle be not found does not necessarily mean there is fair doubt of its ultimate form.

B.
Beyond this, Williams tells us he must be acquitted because the prosecution has pursued him on the wrong charge. If the proof shows him guilty of anything, Williams insists that is the offense of grand larceny, Miss. Code Ann. § 97-17-41 (1972), and not receiving stolen property under Section 97-17-69. Williams' legal premise is technically sound. Our law has long held one may not feloniously receive what he has stolen. The fact that one has stolen the property at issue is generally adequate to require a directed verdict of acquittal should that person be charged with receipt of stolen property.[3]See, e.g., Whatley v. State, 490 So.2d 1220, 1223 (Miss. 1986); Hentz v. State, 489 So.2d 1386, 1389 (Miss. 1986).
The quick answer here is that no evidence puts Williams on the scene in Madison County when the skidder was stolen. That Williams may have anticipated receiving the skidder if Leach and Breazeale *1304 successfully stole it does not preclude the prosecution's proceeding against Williams under Section 97-17-69 for receiving stolen property. See Knowles v. State, 341 So.2d 913 (Miss. 1977).

IV.
Williams argues that the Circuit Court erred when it allowed the prosecution to try him on a guilt-by-association theory. He complains primarily of the prosecution's proffer in opening statement that Leach was an accomplice who had previously pled guilty to the theft of the skidder.[4] He complains further that MHP Officers Boozer and Edwards told the jury that Williams was a friend and associate of Pat Lewis[5] and Andy Hillhouse.[6]
Of course, a finding of guilt may not be founded upon the accused's association with others. Davis v. State, 586 So.2d at 821; Vickery v. State, 535 So.2d 1371, 1379 (Miss. 1988); Matula v. State, 220 So.2d 833, 836 (Miss. 1969). One felon's guilt does not in fact and may not in law suggest the guilt of another. See Rule 401, Miss. R.Ev. We regard it improper that a co-indictee's conviction be placed before the jury in circumstances where this may unfairly prejudice the case of the accused. See, e.g., Malone v. State, 486 So.2d 360, 365 (Miss. 1986) (citing cases holding thus). Williams seizes particularly on this premise in support of the present claim.
After voir dire, the prosecution did not mention Kenneth Leach's guilty plea, but it definitely did prove that Kenneth Leach stole the skidder. This is an offense legally separate and distinct from receiving stolen property. See 3 Wharton's Criminal Evidence § 612 (Torcia ed. 1987). Indeed, the fact that one has stolen the property is sufficient to require a verdict of acquittal should that same person be charged with receipt of stolen property, a point noted above. Put another way, one element of the charge against Williams was that the property was stolen. The prosecution was required to prove this fact, and it makes sense that the best way to do this was to call the thief and have him admit his theft. Common sense suggests proving the skidder was stolen without saying who stole it may leave an appropriately skeptical jury a bit unconvinced.
In the face of this, Williams cites only the rule: the fact of the co-participant's conviction should not be placed before the jury. The point is not so simple as Williams supposes. The rule he cites has arisen and been enforced in circumstances quite distinguishable from today's. It is easy to see the unfairness of allowing the prosecution to impeach a co-indictee/witness-for-the-defense with proof another jury has already tried and convicted the co-indictee. Henderson v. State, 403 So.2d 139, 141 (Miss. 1981); Ivy v. State, 301 So.2d 292 (Miss. 1974); McCray v. State, 293 So.2d 807 (Miss. 1974). The same may be said when the co-indictee has pleaded guilty but then recants. Pieper v. State, 242 Miss. 49, 134 So.2d 157 (1961). Apparent as well is the legal irrelevance of proof of conviction, on trial or plea of guilty, of an absent, non-testifying co-indictee. State v. Thornhill, 251 Miss. 718, 726-27, 171 So.2d 308, 312 (1965); Pickens v. State, 129 Miss. 191, 195, 91 So. 906 (1922). Our only case approaching today's facts  a testifying co-participant who pleaded guilty  is Buckley v. State, 223 So.2d 524 (Miss. 1969). Buckley accumulated several errors to reverse, beyond which the opinion describes a number of exacerbating circumstances not present here.
*1305 Williams' argument founders on experience which has taught that fairly tried criminal causes often require the attendance and testimony of co-felons. This is particularly so in cases like today's. The rule he cites, even if it could be stretched to cover these facts, is just one side of the jurisprudence co-felon testimony has generated. The oft-maligned though practicably necessary plea bargaining process usually yields a lesser punishment or favored treatment for the co-felon caught in the prisoner's dilemma.[7] Without this consideration, the prosecution might well be unable to procure the testimony necessary to bring the principal offender to justice.
But, because we allow this, because we accept the necessity of co-felon testimony, does not mean we are blind to its hazards. For one thing, such a plea bargaining co-felon is likely subject to impeachment by reason of his conviction. Rule 609, Miss. R.Ev. The district attorney may on voir dire legitimately inquire of prospective jurors how they would regard the fact that a part of the case for the prosecution will rest on the testimony of a convicted felon. Beyond this, co-participants are hardly disinterested witnesses. Where the prosecution produces a witness such as Kenneth Leach, settled law gives the accused a right upon request that the details of any plea bargain inducement be disclosed to the jury and in pre-trial discovery as well. See, e.g., Culberson v. State, 580 So.2d 1136, 1138 (Miss. 1990); White v. State, 532 So.2d 1207, 1212-13 (Miss. 1988); Suan v. State, 511 So.2d 144, 147-48 (Miss. 1987); Malone v. State, 486 So.2d 367, 368-69 (Miss. 1986); and King v. State, 363 So.2d 269, 274 (Miss. 1978). Beyond impeachment, the defense may often strike a telling blow by telling the jury the prosecution proceeds with "bought" testimony. This happened here as the witness Kenneth Leach took the witness stand and admitted that he stole the skidder and then described Williams' role in the process insofar as he was aware of it. The prosecution did not show that Leach had been formally convicted of grand larceny. That was left to the defense, which brought out that Leach had pleaded guilty and had been sentenced but that he had not served so much as a day of his sentence, nor paid so much as a penny of his fine.
There is a further dimension to the point. Trial courts sensitive to circumstances such as these often give cautionary instructions regarding accomplice testimony. See Johns v. State, 592 So.2d 86 (Miss. 1991); Burke v. State, 576 So.2d 1239, 1242 (Miss. 1991); Davis v. State, 472 So.2d 428, 435 (Miss. 1985); Green v. State, 456 So.2d 757, 758 (Miss. 1984). And, in the case at bar, the Court so instructed the jury regarding prosecution witnesses Kenneth Leach and Jerry Mann.[8] What is more, the Court instructed the jury, at Williams' request, that:
... no inference may be drawn as to the guilt of Tommy Williams because of any relationships or associations with other people.
As is so often necessary, we accept that the jury has followed the instructions of the Court. See, e.g., Folk v. State, 576 So.2d 1243, 1250 (Miss. 1991); Dennis v. State, 555 So.2d 679, 682-83 (Miss. 1989); Shoemaker v. State, 502 So.2d 1193, 1195 (Miss. 1987); McFee v. State, 511 So.2d 130, 135, 136 (Miss. 1987); Payne v. State, 462 So.2d 902, 904 (Miss. 1984); Harmon v. State, 453 So.2d 710, 712 (Miss. 1984).
It is true that prosecution proof associated Williams with Leach, Pat Lewis and Andy Hillhouse. Lewis and Hillhouse are *1306 a necessary part of the story because, after four days of law enforcement surveillance, the tracked skidder was first started and sought to be moved by them. MHP Officers Edwards and Gore arrested Lewis and Hillhouse on the spot and found the Jeep Wagoneer Lewis and Hillhouse had arrived in belonged to Williams. MHP Officer Edwards testified that Williams and Lewis were friends. What is apparent is that all of these individuals were involved, albeit arguably peripherally in some instances, and the prosecution's story of the theft of the skidders necessarily involved dropping the names of quite a cast of characters. Moreover, Leach took the witness stand and testified at length regarding his involvement in the theft. In the total context of what happened below, we fail to see how it may have been reversibly prejudicial that the jury was apprised that he had, in fact, pled guilty and been convicted on his plea of guilty.

V.
Williams complains that the Circuit Court erred when it overruled his objections to several prosecution witnesses' suggestion that the camp house was his. He argues that this is hearsay information and, furthermore, that the record is uncontradicted that title to the camp house is vested in Shirley Douglas. As noted above, Shirley Douglas is Williams' sister.
The evidence at issue takes three forms. First, Leach testified that the camp house belonged to Tommy Williams. The defense did not object but, on cross-examination, Leach clarified his statement by saying he "just heard it was Williams' camp house, but could not swear to the ownership. Second, MHP Officer Boozer testified that the camp house has "been known as [Williams'] camp house several years." MHP Officer Edwards described his surveillance activities on June 18, 1987, and said that he saw the skidder in the western part of Oktibbeha County off of the Douglastown Road "behind a camp house known as Tommy Williams'." Third, Sheriff Dolph Bryan of Oktibbeha County testified that he had known Williams for fifteen years and that Williams frequently used the camp house which is situated behind his mother's house. This proof was a part of the prosecution's theory that "he habituates it, uses it, constantly has cookouts, etc." Of course, Williams could have feloniously received the skidder at the camp house whether he owned it or not.
This testimony, though technically hearsay, was likely admissible as reputation within the community regarding the history of and customs affecting the property. Cf. Rule 803(20), Miss.R.Ev. It is true the prosecution's predicate was less than precise and left a bit to be desired. On the other hand, there is substantial corroborating evidence to the effect that Williams was seen on the property, that he did use it regularly, and, even though legal title was in the name of his sister, he had access to it. Moreover, the camp house was near Williams' mother's home, and there was evidence the access road was known as Williams Road. No witness disputed the premise that Williams' family properties lay in the area. Any error was one of form, and, in view of the other testimony, must be labeled harmless. Rule 103(a), Miss.R.Ev.; Rule 61, Miss.R.Civ.P.

VI.
On cross-examination of prosecution witness Jerry Mann, defense counsel sought to exploit perceived discrepancies between Mann's direct testimony and prior statements he had given to law enforcement authorities. Mann had testified he gave the money from the sale of the rubber tired skidder to Tommy Williams. Defense counsel asked whether Mann had given prior "sworn statements to law enforcement officers" to the effect that he had given the money to David Dewberry, Mann's employer. The prosecuting attorney objected, arguing that before answering such a question the witness should be given the opportunity to look at his statements. Defense counsel protested, insisting he had the right to cross-examine the witness before the statement was shown to him. The Circuit Court sided with the prosecution.
*1307 A bit more context is needed. Mann and Dewberry were partners in buying the rubber tired skidder from Breazeale. From the witness stand, Mann explained:
Q. Okay. You and Dewberry I believe were partners 
A. Yes, sir.
Q.  is that correct? And what were y'all in partners on?
A. Just the rubber tired skidder.
Q. As far as buying it?
A. Well I really don't know. He 
Q. Did you give him any money for it?
A. Yes, sir.
Q. How much money did you give him?
A. We put up three thousand dollars.
Q. And we gave him what, twenty-three hundred?
A. Yes, sir.
Q. And he put up the other seven hundred?
A. Yes, sir.
Q. And y'all gave that money to Breazeale?
A. No, sir.
Q. Who did you give  did you give the money to anybody? You gave the money to David Dewberry.
A. He said Breazeale had called and said give the money to Tommy [Williams] and he'd get it from Tommy.
Q. Are you saying you gave the money to Tommy?
A. Yes, sir.
In Mann's three statements to the police he had said (1) that a few days after the lowboy breakdown[9] David Dewberry, his boss, asked him to go in on the skidder so "I gave him $2300 ..." and (2) "David Dewberry and I were supposed to be partners on the skidder I gave him $2300... ." The third statement did not refer to the money. During the trial, as just noted, Mann testified otherwise, viz. that Dewberry told him to give the money to the defendant and David Breazeale would get it from him.
Few doubt that the essence of confrontation is the right to cross-examine, that the best test of the truth of testimony is that it be cured in the crucible of cross-examination. Hall v. State, 539 So.2d 1338, 1346 (Miss. 1989); Prewitt v. State, 156 Miss. 731, 735, 126 So. 824, 825 (1930). One of the most legitimate and valuable weapons in cross-examining counsel's arsenal is the prior inconsistent statement. Hall v. State, 250 Miss. 253, 264, 165 So.2d 345, 350 (1964). Thus, our Rule 613(a), Miss. R.Ev., provides:
... In examining a witness concerning a prior statement by him, whether written or not, the statement need not be shown nor its contents disclosed to him at that time, but on request the same shall be shown or disclosed to opposing counsel.[10]
Williams reads the rule rightly.
Williams was required to tender the statements to counsel opposite prior to the cross-examination, but this was but a formality, as the statements were ones Mann had previously given law enforcement officers. On the other hand, the prosecutor and Circuit Court were clearly wrong about requiring defense counsel to show the statement to the witness himself prior to or during questioning. The (in)famous rule of Queen Caroline's Case, 2 Br. & B. 284, 286-90, 129 Eng.Rep. 976, 11 Eng.Rul.C. 183 (1820)  that the witness must be shown the statement before he may be questioned about it  has been substantially altered. See Official Comment to Rule 613(a), Miss.R.Ev.; 10 Moore's Federal Practice § 613.01[3] (2d ed. 1988).
Our new rule recognizes what is but common sense, that if counsel is to test effectively the credibility and testimony of an opposing witness, he must be allowed to *1308 ask him about prior statements and to do so without the witness having the crutch of the prior statement to "refresh" his memory. There may be times when cross-examining counsel wants to present the prior statement to the witness and in this manner confront him with it, but the rule allows counsel to lay his predicate by questioning before the statement is shown to the witness.
Of course, once the cross-examination is complete, counsel for the party calling the witness may certainly show the statement to the witness, and the witness may be given every opportunity to explain or otherwise comment upon the statement. See Rule 613(b), Miss.R.Ev.; and Marcum v. Mississippi Valley Gas Co., 587 So.2d 223, 226 (Miss. 1991), recognizing relaxation of Davis v. State, 431 So.2d 468, 472-73 (Miss. 1983), which had relied on another feature of the rule in Queen Caroline's Case.[11] And there may be occasions when, in the course of controlling the process and examination of witnesses, see Rule 611(a), Miss. R.Ev., the Court may, to avoid repetitious, incoherent or bungling process, require that the statement be handed to the witness if counsel wishes to pursue the point, as, for example, where counsel wants to go through a witness' prior deposition line by line. But none of this should be construed as was done here to take away counsel's right to confront as he sees fit, and to secure from the witness such advantage as his wits may win him.
In the end, Williams was able to place before the jury Mann's prior inconsistent statements, such as they were. Mann admitted before the jury that he had previously sworn "I gave him [David Dewberry, not Tommy Williams] twenty-three hundred and he never gave me any back." What Williams lost was the tactical weapon of surprise, calculation of the value of which is problematical at best on appeal. We wish to reiterate that Rule 613 means what it says and that it does, indeed, alter pre-1986 practice. Still, the matter was handled below so that the error may only be seen as harmless.

VII.
Williams further complains of a portion of the prosecuting attorney's closing argument to the jury which is said to have implied that Williams was the head of a crime organization, if not the godfather of Oktibbeha County. The argument reads as follows:
... When I was a little boy I read a book called, "Twenty Thousand Leagues Under the Sea." Maybe some of you read it too. Jules Verne wrote it ... and it's about a guy with a submarine and he goes over the world and what have you, and there's a scene in that particular book where a monster comes out of the ocean and it's a kind of like a large octopus has tentacles that grab the submarine. And in the book the men came out in the top of the submarine and they tried to fight the monster and every time they cut a tentacle off the monster another tentacle came back. and the only way to kill the monster was to cut off its head. Ladies and Gentlemen, that is just what this case is about. There are always going to be two bit crooks. They're always going to be out there. If not Kenneth Leach there would have been somebody else that would have been willing to seat these for a couple of thousand dollars. If not Jerry Mann there'd have been somebody else who was down on his luck and needed a few extra bucks who'd have gone down there to unload that particular skidder. They are always going to be here, but, ladies and gentlemen, they are just tentacles. That's all they are. If you lop one of those off, another one is going to take his place because the only way to kill the monster is to cut off his head. Ladies and gentlemen, that's exactly what this trial is all about. That is exactly what this trial is all about because the head of the monster, ladies and gentlemen, is Tommy Williams. He's the one that runs the organization, so to speak.
Defense counsel objected to this line of argument, and the Court overruled the objection.
*1309 The point suggests the oft-quoted passage from Nelms & Blum Co. v. Fink, 159 Miss. 372, 131 So. 817 (1930).
Counsel necessarily has and must have to serve his function and office, a wide field of discretion. He may comment upon any facts introduced in evidence. He may draw whatever deductions seem to him proper from these facts, so long as he does not use violent and abusive language, and even in many cases invectives may be justified and even called for, as eloquently pointed out by Chief Justice WHITFIELD in Gray v. State, 90 Miss. 235, 43 So. 289. Counsel is not required to be logical in argument; he is not required to draw sound conclusions, or to have a perfect argument measured by logical and rhetorical rules; his function is to draw conclusions and inferences from evidence on behalf of his client in whatever way he deems proper, so long as he does not become abusive and go outside the confines of the record. Usually when the argument is considered as a whole it is found consistent and logical and frequently eloquent. Some of the greatest speeches in our history have been made within the courthouse. As has been said, the court cannot control the substance and phraseology of counsel's argument; there is nothing to authorize the court to interfere until there is either abuse, unjustified denunciation, or a statement of fact not shown in evidence.
Counsel may draw upon literature, history, science, religion, and philosophy for material for his argument. He may navigate all rivers of modern literature or sail the seas of ancient learning; he may explore all the shores of thought and experience; he may, if he will, take the wings of the morning and fly not only to the uttermost parts of the sea but to the uttermost limits of space in search of illustrations, similes, and metaphors to adorn his argument. He may reach the uttermost heights of attainable eloquence, soar into the empyrean heights where his shadow may fall on the loftiest mountain top, as the eagle in its loftiest flight. He may borrow from every source, modern and ancient, such materials as he needs for his argument. He may clothe the common occurrences of life in the habiliments of poetry and give to airy things a habitation and a name. He may weave of words a rhetorical bouquet that enchants the ear and mesmerizes the mind. He may make the learning of the ages the servant of his tongue. His argument may be as profound as logic and learning can make them. He may give wing to his wit and play to his imagination so long as he does not imagine fact not in evidence, which the court does not take judicial knowledge of, or does not go out of the record for the facts not in evidence. As to the facts in evidence, he may array them in such figures and form and clothe them with such ideas and conclusions as he can conjure up in his mind for the best interest of his cause.
He cannot, however, state facts which are not in evidence, and which the court does not judicially know, in aid of his evidence. Neither can he appeal to the prejudices of men by injecting prejudices not contained in some source of the evidence.[12]
Nelms & Blum, 159 Miss. at 382-83, 131 So. at 820-21. We have accepted these premises in criminal cases as well as civil. See, e.g., Shell v. State, 554 So.2d 887 (Miss. 1989), vacated on other grounds, 498 U.S. ___, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990); Johnson v. State, 416 So.2d 383, 391 (Miss. 1982); Gray v. State, 351 So.2d 1342, 1346-47 (Miss. 1977). Important statements to like effect appear in Dunaway v. State, 551 So.2d 162, 163-64 (Miss. 1989); Monk v. State, 532 So.2d 592, 601 (Miss. 1988); and Adams v. State, 202 Miss. 68, 30 So.2d 593, 596 (1947).
Here, prosecuting counsel drew upon literature to draw an inference fairly supported by the evidence, viz. that Williams *1310 masterminded and was from the beginning the intended beneficiary of the theft of the skidder. His appearance on the highway on the night of June 4, when the lowboy broke down, his presence at the camp site when the skidder was delivered, and particularly the testimony of Jerry Mann suggest that Williams was the man in charge. We think prosecuting counsel was within the law and the evidence in the argument at issue.

VIII.
Williams asserts a number of additional points wherein he says the Circuit Court erred. We have considered each with care and find that none merits either discussion or reversal. Turner v. State, 573 So.2d 1340, 1343 (Miss. 1990); Saucier v. State, 562 So.2d 1238 (Miss. 1990); Morea v. State, 329 So.2d 527 (Miss. 1976).
Williams argues in the aggregate that these and the errors recited above require reversal, citing Collins v. State, 408 So.2d 1376, 1379-81 (Miss. 1982). Our study of the record and reflection upon this point leave us convinced that these matters, considered singly or in the aggregate, did not operate to deprive Williams of his right to a fair trial. See Rule 103(a), Miss. R.Ev.; Doby v. State, 557 So.2d 533, 542 (Miss. 1990); Ponthieux v. State, 532 So.2d 1239, 1248 (Miss. 1988).
CONVICTION OF RECEIVING STOLEN PROPERTY AND SENTENCE OF FIVE YEARS IMPRISONMENT AND $5,000.00 FINE AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
NOTES
[1] Unobjected to testimony in the record suggests Breazeale is the son of Tommy Williams, Defendant below and Appellant here.
[2] This instruction is a faithful replication of the legislative prescription which, in relevant part, reads:

If a person buy or receive in any manner or on any consideration personal property of any value, feloniously taken away from another, knowing the same to have been so taken, he shall be guilty of receiving stolen goods, ... .
Miss. Code Ann. § 97-17-69 (1972).
[3] The intricacies of the offense of receiving stolen property vis a vis grand larceny and other like offenses make it apparent the public would profit were the legislature to revisit, consolidate and modernize the laws of theft and misappropriation, a point we have of late repeatedly noted. See Davis v. State, 586 So.2d 817, 822 fn. 1 (Miss. 1991) (Banks, J., dissenting); Murphy v. State, 566 So.2d 1201, 1206 fn. 3 (Miss. 1990); and Pennock v. State, 550 So.2d 410, 413 fn. 5 (Miss. 1989).
[4] See State v. Kenneth Leach, David Breazeale, Tommy Williams and Archie Ricks, Madison County Circuit No. 1239, charging grand larceny of both skidders. Leach pleaded guilty to two counts of grand larceny and received sentences of thirty days to serve, plus a $2,250.00 fine, and twenty-three months suspended, respectively.
[5] See State v. George Patton Lewis, convicted in Oktibbeha County Circuit Court for receiving the same tracked skidder at the April 1988 term, but reversed and remanded on appeal. Lewis v. State, 573 So.2d 713 (Miss. 1990).
[6] See State v. Andy Hillhouse, Oktibbeha County Circuit Court No. 11-445. Hillhouse pleaded guilty to the receipt of the tracked skidder at the July 1988 term.
[7] See Pennock v. State, 550 So.2d 410, 412 (Miss. 1989); United States v. Romano, 583 F.2d 1, 9 (1st Cir.1978); R. Axelrod, The Evolution of Cooperation 7-10 (1986); J. Coleman, Afterword: The Rational Choice Approach to Legal Rules 65 Chi.-Kent L.Rev. 177, 184 n. 6 (1989), citing R. Nozick, Philosophical Explanations 542 (1981).
[8] INSTRUCTION 3
The Court instructs the jury that the witnesses Jerry Man [sic] & Kenneth Leach are alleged accomplices for the same crime that Tommy Williams is charged with; and that in considering their testimony, you should weigh it with great care and caution, and consider that they are alleged accomplices in determining how much weight and creditability you will give their testimony.
[9] Jerry Mann was not involved in the subsequent move of the track-skidder to the camp house area.
[10] For further explication of this discrete area of evidence law, its history and policy groundings, see United States v. Dilliard, 101 F.2d 829, 837 (2d Cir.1938); 3A Wigmore on Evidence §§ 1025, 1026 (Chadbourn rev. ed. 1970); 4 Jones on Evidence: Civil and Criminal § 26:5 (Gard ed. 1972); 3 Weinstein's Evidence § 613[03] (1991); McCormick on Evidence § 28 (Cleary ed. 1984); Ladd, Some Observations On Credibility: Impeachment Of Witnesses, 52 Cornell L.Q. 239, 245-49 (1967).
[11] See generally, Staton, Ellis and Williams' Mississippi Evidence 153-54 (2d ed. 1988).
[12] Legal lore has it that the Court plagiarized much of this passage from the brief of William Alexander Percy, long poet laureate of the Delta. See Nelms v. Blum, 159 Miss. at 375, 131 So. 817.