# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-01101-COA

**OCTAVIUS MONTEGO RODAS BLACK A/K/A**  **APPELLANT**
**OCTAVIUS MONTEGO BLACK**

**v.**

**STATE OF MISSISSIPPI**  **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 08/03/2022 |
| TRIAL JUDGE: | HON. ROBERT P. KREBS |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | SPENCER MARK RITCHIE |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | ANGEL MYERS McILRATH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 01/16/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., GREENLEE AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT**:

¶1.     Angry over his ejection from her home, a man demanded a woman give him her car keys.  When she refused, he attacked her and took them by force.  Her body was found the next morning and showed signs she had been run over by a vehicle.  The man was arrested, charged with capital murder based on robbery, and ultimately convicted by a jury of his peers.

¶2.     He now appeals, claiming he was denied a lesser-included-offense jury instruction, his defense lawyer was improperly restrained during closing arguments, and the jury should

not have seen a transcription of his interrogation video. Finding no error, we affirm.

**BACKGROUND**

¶3.    Betty Vaughans was a fifty-seven-year-old registered nurse. She owned and operated a personal care home and lived next door. Betty had two biological daughters and a foster daughter named Teicie Hutchins, whom she treated like her own. Betty had recently reached out to Teicie and her husband, Octavius Black, to move near her so she could help them out financially. They first lived in the personal care home next door to Betty—expense-free. At some point she helped them move into an apartment not far from her home.

¶4.    On October 3, 2021, Teicie locked Black out of their apartment after she suspected him of cheating on her. Black "walked from the apartment to Miss. Betty's house" to ask her for a place to stay. Black went to Betty for help because "usually when [they] get into it, [he] can stay there[,] . . . or she'll put [him] in a hotel or something." However, according to Black, this time Betty said, "I couldn't stay there that night because she had a new client."

¶5.    Upset that Betty refused to help him out this time, Black "choked" Betty "with his arm" until she passed out. Black explained, "I tried to pick her up and she fell forward." Black then "went in the house and got the keys . . . from a white thing that she hangs them on." Black told the officer, "[W]asn't no way else I was gone get the keys." As he was driving away, Black ran over Betty in her driveway.

¶6.    The next morning, Teicie found her foster mother's body and called 911. Three days later, Black turned both himself and the vehicle in to the Prentiss Police Department, where

2

he had driven the vehicle on the night of the murder.

¶7.    Black was interviewed, and although he initially denied any knowledge of what had happened to Betty, he later confessed that he took her vehicle by force and told officers he felt "a bump" as he left her home.

¶8.    He further confessed that after taking Betty's vehicle without her permission, he took money that he had found in her center console and threw her cell phone out somewhere along the interstate. Once he discovered the police were looking for Betty's vehicle, he removed her personalized tag. He was arrested and later indicted for the capital murder of Betty.

## PROCEDURAL HISTORY

¶9.    At trial, the jury heard testimony from Betty's daughter Teatta Hutchins. Teatta testified that her mother contacted Teicie so that Teicie, Black, and the children could come live in the home next door to her mother. She further testified that Betty paid the bills in the home until August 2018 when she helped pay for them to move into their own apartment. Notably, Teatta testified her mother would often allow Teicie and Black to use her vehicle to get groceries and run errands.

¶10.    Next, the jury heard testimony from Detective Kimberly Snowden. Detective Snowden testified that she interviewed Black. During the recorded interview, Black confessed to "chok[ing]" Betty and taking her vehicle.

¶11.    On cross, counsel for Black pressed the officer whether she had lied to Black to obtain a confession. The focus was whether she had security video of Black. Officer Snowden had

3

told Black she had video footage—which was untrue. She conceded, "I did tell him that I would be looking at video, possible evidence of video evidence, because we were made aware that there were some cameras across the street; however, there was no video that was available for us to use." Defense counsel asked, "So, you were misleading him, hoping it would elicit something from him?" Detective Snowden replied, "Yes."

¶12. Defense counsel next pressed the officer whether she had DNA evidence from the scene.

> Q:    Right. But you had indicated that there seemed to be blood on the
>        vehicle?
> A:    Yes.
> Q:    But we know now that it wasn't blood; correct?
> A:    I know that now, yes.

¶13. The officer's misrepresentations became a focus of defense counsel's closing:

> She lied to him. She told him she had DNA evidence. The State agrees, there
> is no DNA evidence. She said there was blood on the car. The State agrees,
> there is no blood on the car. Nothing was found on that vehicle. She said she
> saw those tire tracks and she saw the tire imprints from the Cadillac, and she
> said those match. That was a lie, too. You heard the tire expert testify that he
> could rule out two of the tires, and then- -

The State then objected, arguing the officer had not lied. The court ruled as follows:

> I'll ask you to disregard that. I think what we settled on yesterday, [defense
> counsel], was misleading. Big difference. Move on, please.

¶14. During the jury instruction conference defense counsel requested a lesser-included-offense instruction for manslaughter. The trial court reviewed a recent Court of Appeals case and concluded that denying the proposed instruction was proper.

4

¶15. Following the jury trial, Black was convicted and sentenced to life without the possibility of parole. Black moved for judgment notwithstanding the verdict or, in the alternative, a new trial. The trial court denied the motion. Black now appeals.

**STANDARD OF REVIEW**

¶16. "In general, the grant or denial of a proposed jury instruction is reviewed for abuse of discretion." *Anderson v. State*, 361 So. 3d 609, 614 (¶13) (Miss. 2023). "This includes the Court's *granting* of a lesser-included-offense instruction." *Id.* (emphasis added). However, "[w]e review a trial judge's *denial* of a lesser-included-offense jury instruction de novo." *Id.*

**DISCUSSION**

**I.   The manslaughter instruction was properly rejected.**

¶17. Black argues that the trial court erroneously refused his proposed lesser-included-offense jury instruction on manslaughter. Specifically, he argues testimony provided at trial would have supported the instruction.

¶18. In deciding to deny the instruction, the trial court relied upon a recent case from this court, *Kelly v. State*, 306 So. 3d 849, 854 (¶18) (Miss. Ct. App. 2020). There, the victim was killed while the defendant was attempting to rob and burgle the victim's home. *Id.* Once testimony concluded, the defendant "proposed a number of instructions, . . . including . . . one on culpable manslaughter." *Id.* The requested instructions were refused. *Id.*

¶19. On appeal, the defendant argued that the trial court "erroneously rejected his proposed

5

culpable-negligence manslaughter instruction." *Id*. at 859 (¶31). We rejected this concept, finding that "[b]ecause [the defendant] had no defense to the attempted burglary charge and because any killing during the commission of the attempted burglary qualifies as capital murder, [he] was still potentially guilty of capital murder whether or not a manslaughter instruction had been given." *Id*. Since "the State was not required to prove the elements of the other forms of murder[,] . . . the State needed only to prove that [the victim] was killed . . . ." *Id*. at 862 (¶39); *see also Jacobs v. State*, 870 So. 2d 1202, 1209 (¶19) (Miss. 2004) ("[B]ecause Jacobs was found guilty of robbery, and the death resulted in the commission of the robbery, Jacobs is guilty of capital murder regardless of whether a lesser-included offense instruction is given.").

¶20. We agree with the trial court that "the facts here are almost on point" with the situation in *Kelly*. Like in that case, the State proposed a capital murder instruction because Betty had been killed in the course of Black robbing her of her vehicle. He confessed that he went to Betty's house, "choked her until she passed out," entered her home to retrieve her car keys, and drove off in her vehicle. Like the defendant in *Kelly*, Black offered no defense to the underlying charge of robbery. Just as in *Kelly*, to meet the elements of capital murder, the State was only required to prove that Betty was killed during the course of the robbery.

¶21. Accordingly, we find it was not an error to deny the requested instruction.

**II.    The defense was not improperly limited in its closing argument.**

¶22. Black next argues the trial court improperly restricted his defense counsel during

closing arguments. Specifically, he argues the trial judge should not have sustained the State's objection to his characterization that Detective Snowden was a "liar."

¶23. It is a long standing rule in our State that a lawyer in closing argument "may comment upon any facts *introduced in evidence* . . . [and] draw whatever deductions seem to him proper from these facts, so long as he does not use violent and abusive language. . . ." *Nelms & Blum Co. v. Fink*, 159 Miss. 372, 382, 131 So. 817, 820 (1930) (emphasis added). "[T]here is nothing to authorize the court to interfere until there is either abuse, unjustified denunciation, *or a statement of fact not shown in evidence*." *Id*. (emphasis added). Our modern precedent is also clear that lawyers "are permitted to argue anything . . . that was presented as evidence." *Moffett v. State*, 156 So. 3d 835, 858 (¶63) (Miss. 2014). "In general, parties may comment upon any facts introduced into evidence, and may draw whatever deductions and inferences that seem proper from the facts." *Ross v. State*, 954 So. 2d 968, 1002 (¶74) (Miss. 2007).

¶24. During closing, counsel for Black focused on how law enforcement had distorted what evidence they had obtained in order to push the defendant to confess. During a heated cross of Detective Snowden, defense counsel had elicited from her that she had "misrepresented" to Black she had security camera footage and also DNA, all of which she hinted was damaging to his case.

¶25. Counsel expounded upon this theory in closing, arguing to the jury, "She lied to him. She told him she had DNA evidence . . . . She said she saw those tire tracks and she saw the

7

tire imprints from the Cadillac, and she said those match. That was a lie, too."

¶26. At this point the State objected, and the trial court sustained, telling the jury "to disregard that." The judge told defense counsel, "I think what we settled on yesterday" was that law enforcement had been "misleading" and that this was a "[b]ig difference. Move on, please."

¶27. Our precedent grants wide latitude to lawyers in closing arguments, but only to the extent that they rely upon those facts in evidence. While the detective admitted she had misled Black as to whether there was security camera footage or other evidence, she denied lying, and there was no proof in the record of an explicit lie. While Black protests he was prejudiced by the trial court's sustaining of the objection—arguing "the message conveyed . . . was that the prosecution was incapable of telling a lie and must be trusted"—defense counsel was explicitly allowed to argue that law enforcement had misled the defendant and use other acceptable forms of inference.

¶28. We find this was not an improper restriction by the trial court and was in line with our precedent requiring lawyers to "[s]tay in the record[.]" *Nelms & Blum*, 131 So. at 820.

### III. The trial court was not required to issue a cautionary instruction.

¶29. Lastly, Black argues that the trial court erred by not issuing a cautionary instruction regarding the written transcript of the interview video that was published to the jury. Specifically, he argues that the jury should have been instructed to rely solely on their memory of the video recording for evidence and not the written transcript. But he did not

8

request such an instruction in the trial court.

¶30. Our "precedent reflects that a trial court will not be held in error for failing to issue a cautionary instruction of this nature where no such instruction is requested." *Brown v. State*, 282 So. 3d 1192, 1202 (¶40) (Miss. Ct. App. 2019).

¶31. When Black's recorded confession was admitted into evidence, the trial court allowed the jury to review the written transcript while they viewed the recording. Defense counsel objected—not to the accuracy of the transcript but that it would be overly prejudicial for the jury to have the transcript while deliberating. The trial court agreed with defense counsel. The trial court then precluded the jury from viewing the transcript during its deliberations, requiring the jurors to return their copies of the transcript once the State had published the video.

¶32. We have recently rejected the same argument made by Black in this case. In *Brown*, the defendant "ma[de] no argument at all that he was deprived of a fair trial because the trial court did not issue a transcript-based cautionary instruction." *Id*. at 1203 (¶45). "Nor do we find any indication in the record that the absence of such a cautionary instruction deprived him of a fair trial." *Id*. "We [found] that Brown's assertion that the trial court erred by failing to issue a cautionary instruction, sua sponte, is without merit." *Id*.

¶33. For the same reason, we find that Black's assertion that the trial court erred in failing to issue a cautionary instruction is without merit.

**CONCLUSION**

9

¶34. Because Black was indicted for capital murder and did not have a defense to the underlying charge of robbery, a manslaughter instruction would not have changed the result, so it was not error for the trial court to deny it. Additionally, as precedent has long established, the defense was not limited nor restricted in its closing argument. Further, the argument regarding a sua sponte cautionary instruction lacks merit.

¶35. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR. McDONALD, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.**