# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-DR-00230-SCT

*WILLIE JEROME MANNING a/k/a "FLY"*

*v.*

*STATE OF MISSISSIPPI*

## ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 11/08/1994 |
| TRIAL JUDGE: | HON. LEE J. HOWARD |
| COURT FROM WHICH APPEALED: | OKTIBBEHA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF CAPITAL POST-CONVICTION COUNSEL<br>BY:  DAVID VOISIN<br>     ROBERT M. RYAN |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | FORREST ALLGOOD |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | PETITION FOR POST-CONVICTION RELIEF, DENIED - 03/09/2006 |
| MOTION FOR REHEARING FILED: | 09/19/2005 |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     The motion for rehearing is denied.  The original opinion is withdrawn, and this opinion is substituted therefor.

¶2.     Willie Jerome Manning was convicted of capital murder of Jon Steckler and Tiffany Miller in Oktibbeha County in 1994.  He was sentenced to death one day later, on November

8, 1994. Manning's conviction and sentence were affirmed by this Court in *Manning v. State*, 726 So.2d 1152 (Miss. 1998). The motion for rehearing was denied on October 8, 1998. The United States Supreme Court denied Manning's petition for writ of certiorari on April 5, 1999. *Manning v. Mississippi*, 526 U.S. 1056, 119 S.Ct. 1368, 143 L.Ed.2d 528 (1999).

¶3.     After denial of the petition for writ of certiorari, in accordance with *Jackson v. State*, 732 So.2d 187 (Miss. 1999), we remanded the matter to the Circuit Court of Oktibbeha County for appointment of post-conviction counsel. The circuit court then appointed the Office of Capital Post-Conviction Counsel (OCPCC) to represent Manning in post-conviction relief proceedings.

¶4.     We find no merit in Manning's petition to proceed in the trial court on post-conviction relief. Therefore, the petition for post-conviction relief is denied.

### FACTUAL BACKGROUND

¶5.     On December 11, 1992, Tiffany Miller and Jon Steckler, both Mississippi State University students, were shot and killed in Oktibbeha County, Mississippi. They were last seen leaving Jon's fraternity house around 1:00 a.m. on December 11, 1992. Tiffany drove a Toyota MR2 sports car and lived off campus at the University Hills Trailer Park.

¶6.     A motorist discovered Jon Steckler lying on the right side of Pat Station Road at approximately 2:15 a.m. When Deputy Sheriff Robert Elmore arrived at the scene at 2:33 a.m., Jon still had a pulse. While waiting for an ambulance, Deputy Elmore noticed drag marks through the gravel road into the woods, and there he discovered Tiffany's body. She had been shot twice in the face at close range. Jon was shot once in the back of the head and had

2

extensive abrasions occurring prior to his death, which were consistent with being run over by a car at low speed. Tiffany's car was found the next morning parked in front of apartments on Old Mayhew Road, approximately one hundred yards from her residence at the University Hills Trailer Park.

¶7. In the early hours of the morning of the murder, John Wise, Jon Steckler's fraternity brother, went to his car which was parked outside the fraternity house. At that time, he did not notice anything suspicious and locked his car. Later in the morning, Wise found that his car had been broken into and several items stolen. Several of the stolen items were later linked to Willie Jerome Manning through testimony of several of the State's witnesses. One of the items reported stolen from Wise's car was a gold-colored token. Subsequently, a gold token, very similar to the one reported stolen from Wise's car, was recovered at the murder scene.

¶8. The prosecution initially indicted Manning for murder in the course of a kidnapping, but later amended the indictment, substituting a robbery charge. The State introduced evidence purporting to link the stolen items, including a leather jacket, a CD player, the gold token, and a silver engraved beverage holder to Manning. The State also introduced testimony that Manning attempted to sell a watch and ring matching the description of the watch and ring that Jon Steckler was wearing the night he was killed. Much of the testimony regarding the stolen items came from Manning's former girlfriend, Paula Hathorn. More testimony came from two jailhouse informants who testified that, while incarcerated, Manning admitted killing the students and selling the gun he used.

3

¶9.    Manning argues that the lack of physical evidence linking him to the crime, together with questionable testimony from witnesses was inadequate to support a capital murder conviction.    There were no matching fingerprints or footprints at the scene linked to Manning. Manning asserts the testimony of Hathorn was not credible because she was induced by a $25,000 reward for solving the crime and the State's lenient treatment on a number of charges pending against her.    Manning seeks to discredit the testimony of the jailhouse informants, noting one of the informants initially gave a false statement to the police implicating two other suspects.

## DISCUSSION

¶10.    This Court has long recognized that post-conviction relief actions have become part of the death penalty appeal process. *Jackson v. State*, 732 So.2d 187, 190 (Miss. 1999).    Our standard of review of capital convictions and sentences is one of "heightened scrutiny" under which "all doubts are to be resolved in favor of the accused." *Flowers v. State*, 842 So.2d 531, 539 (Miss. 2003) (citing *Balfour v. State*, 598 So.2d 731, 739 (Miss. 1992)); *Williamson v. State*, 512 So.2d 868, 872 (Miss. 1987) (citing *Irving v. State*, 361 So.2d 1360, 1363 (Miss. 1978)).

¶11.    In his Petition for Post-Conviction Relief, Manning raises numerous claims.    The majority of those claims relate to the State's failure to disclose evidence and claims of ineffective assistance of counsel.    While the Court has considered all of Manning's claims separately, the claims have been combined for clarity as:    I) failure to disclose exculpatory

4

evidence; II) polygraph examination; III) ineffective assistance of counsel; and, IV) cumulative errors.

### I. Exculpatory Evidence

¶12.    Manning argues the State presented testimony from Frank Parker that included numerous lies and misrepresentations; that the State knew or should have known Parker was lying; and, that despite exercising due diligence, defense counsel was not able to uncover impeachment material, the truth about Parker's pending charges in Texas, or other evidence of his motivation for testifying.    Manning asserts Parker lied about pending criminal charges against him and lied about the severity of those charges, and that he denied his testimony was motivated by the possibility of reward money.    Further, Manning asserts it was never disclosed that authorities in Mississippi had actually shown Parker crime scene photos and promised to help him with the criminal charges pending in Texas.    Manning argues Parker's testimony was crucial to the prosecution and was the only link between Manning and the gun used to kill the students.    Manning argues the State knowingly presented false testimony, and that due to the crucial nature of this testimony, the State cannot show beyond a reasonable doubt the use of the false testimony was harmless.

¶13.    Manning points out that Fifth Circuit case law and precedent from the U.S. Supreme Court mandate that "a new trial is required if the false testimony could have. . . in any reasonable likelihood affected the judgment of the jury."    **Barrientes v. Johnson**, 221 F.3d 741, 756 (5th Cir. 2000) (citing **Napue v. Illinois**, 360 U.S. 264, 271, 79 S.Ct. 1173, 3 L.Ed. 2d 1217 (1959) and **Giglio v. United States**, 405 U.S. 150, 153-54, 92 S.Ct. 763, 31 L.Ed.2d

104 (1972)).  Manning also cites *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), holding that the suppression of favorable evidence is a violation of the defendant's due process rights.  Favorable evidence includes that which is either directly exculpatory or items which can be used for impeachment purposes.  *Giglio*, 405 U.S. at 153-155.

¶14.    The State asserts this allegation was addressed on direct appeal and is now procedurally barred.  The State argues that the existence and nature of the charges pending against Parker were brought out on direct examination and, in more detail, on cross-examination.  The State also points out the affidavits that Manning now uses to purportedly show Parker had a deal with the State for his testimony, reveal instead that Mississippi authorities never made an explicit promise to help Parker with the criminal charges in Texas until after he had testified.  The State also asserts that Manning fails to show actual prejudice sufficient to overcome this procedural bar.  *Wiley v. State*, 750 So.2d 1193, 1210 (Miss. 1999).  Furthermore, the State argues Manning fails to establish this material to which he points is "exculpatory" material under this Court's analysis of *Brady*, citing *Todd v. State*, 806 So.2d 1086, 1091-92 (Miss. 2001).

¶15.    In determining whether a *Brady* violation has occurred, thus mandating a new trial, this Court applies the four-prong test articulated in *King v. State*, 656 So.2d 1168, 1174 (Miss. 1995) (adopting four-prong test from *United States v. Spagnoulo*, 960 F.2d 990, 994 (11th Cir. 1992)).  The defendant must prove:  (a) that the State possessed evidence favorable to the defendant (including impeachment evidence); (b) that the defendant does not possess the

6

evidence nor could he obtain it himself with any reasonable diligence; © that the prosecution suppressed the favorable evidence; and (d) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different. *Todd*, 806 So.2d at 1092.

¶16.    Manning argues that U.S. Supreme Court precedent instructs the State that its knowing use of or its failure to correct false testimony, or its presentation of evidence which creates a materially false impression of the evidence, violates a defendant's right to due process. *Miller v. Pate*, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967); *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Alcorta v. Texas*, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957); *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935).

¶17.    Manning further asserts the prosecutor knew or should have known that Paula Hathorn was not truthful, but he pressed ahead to rehabilitate her credibility and tarnish the jury's view of the credibility and competence of the defense.  Manning also argues the State had a duty to disclose any agreements or material assurance that it had made to Hathorn in exchange for her testimony and that the State failed to fully disclose the deal that had been made with Hathorn as to her pending charges.  Manning contends the failure to disclose this information impacted his ability to challenge Hathorn's credibility.  The U.S. Supreme Court has held that when the reliability of a given witness may well be determinative of guilt or innocence, non-disclosure of evidence affecting credibility, especially evidence of any understanding or agreement as to a future prosecution, violates due process.  *Giglio*, 405 U.S. at 154-55.  Manning also argues

7

a violation of **Brady** for the State's failure to disclose information associated with Hathorn's testimony. Manning asserts the State failed to disclose the true nature of Paula Hathorn's position as a state agent and withheld tape recordings between Hathorn and Manning that were made at the insistence of and by law enforcement officers. Hathorn was provided a list of topics to cover and was instructed to telephone Manning. Manning asserts the transcripts of those telephone conversations show Hathorn failed to elicit any incriminating statements from Manning and indicate that several of the statements made by Hathorn directly contradict her subsequent trial testimony. Manning also argues it was never disclosed to the defense that the State threatened to charge Hathorn as an accessory after the fact to murder. All of these things, Manning argues, could have been used for impeachment purposes and to illuminate Hathorn's motivation for testifying.

¶18. The State argues Manning fails to back up his claim that there are cassette tapes and transcripts related to Hathorn's testimony. It also contradicts Manning's claim that the defense was not able to impeach Hathorn as to her contradictory statements where the trial transcripts indicate this very information was brought out at trial and on direct appeal. Furthermore, the State notes that Hathorn's relationship with the sheriff's department was also brought out at trial and on direct appeal.

¶19. Pursuant to an Order issued by this Court on December 2, 2004, Circuit Judge Lee J. Howard, the same judge who presided over Manning's initial trial, conducted an evidentiary hearing on January 12, 2005, to determine if the information contained in the cassette tapes and transcripts were exculpatory to Manning, such that a new trial would be warranted. At the

8

conclusion of the evidentiary hearing, the trial court took this matter under advisement and allowed counsel for the State and Manning to submit memoranda of law. On April 22, 2005, the trial court entered its "Evidentiary Hearing Order" wherein it addressed three questions: "(1) Did the State 'suppress' evidence? (2) Is the evidence actually *Brady* material? (3) Is there a reasonable probability that a different verdict would have resulted if the evidence had been used?"[1] The trial court held that no *Brady* violation occurred and a new trial was not warranted. The trial court first determined that no "factual basis exist[ed] to prove the State suppressed the existence of tape-recorded telephone communications between [Manning] and his girlfriend, Paula Hathorn." Testimony reflected that the alleged suppressed evidence was included with all other physical evidence made available to Manning's attorneys. Dolph Bryan, Sheriff of Oktibbeha County, testified there was a voluminous amount of evidence collected by his department. Defense counsel could only argue that he believed the tapes were not made available to counsel because, had they been made available, he would have used them at trial to impeach Paula Hathorn.

---

[1]This evidentiary hearing order, along with the supplemental record from the evidentiary hearing, has been submitted by the trial court to this Court, consistent with our prior order. Upon this Court's receipt of the supplemental record, Manning, through counsel, filed a motion to reset briefing schedule, which was denied by this Court. Likewise, Manning's counsel filed additional pleadings entitled "Motion to Amend Petition to Conform to Evidence Introduced by the State at Evidentiary Hearing (with an attached proposed `Second Amendment to the Petition for Post-Conviction Relief')," and "Petitioner's Objections to the Circuit Court's `Evidentiary Hearing Order.'" For the reasons hereinafter discussed, the motion to amend, and the objections, are denied, as reflected by this opinion and by separate orders this day entered.

¶20. Having listened to the cassette tapes and read the transcripts of the recorded conversations, the trial court determined that very little impeachment value could be attributed to the conversations found on the cassette tapes. The trial court found the conversations were not "relevant, inculpatory, exculpatory, or useful for impeachment" because Hathorn was merely repeating questions to Manning that had been scripted by the Sheriff's Department. Concerning the third question, the trial court determined, after having heard testimony from both parties and having listened to the recorded conversations on the cassette tapes, that "nothing contained therein would be of sufficient impeachment value so as to give rise to a reasonable probability that a different verdict would have resulted if this evidence had been used during the original trial of [Manning]."

¶21. Manning's protestations notwithstanding, we cannot find fault with the findings of the trial court. Defense counsel was given every opportunity to listen to the tapes and view the transcripts, as all evidence was made available to defense counsel, and no evidence was intentionally withheld by the State.[2] Additionally, when applying the four-part test to determine if *Brady* violations occurred in Manning's case with respect to Frank Parker and Paula

---

[2]In his motion to amend, proposed second amendment and objections to the trial court's evidentiary hearing order, Manning opines that the record does not support the trial court's finding that the cassette tapes and transcripts of the Hathorn/Manning telephone conversation were actually included in the large amount of evidence which the State, directly or through law enforcement, made available for review by defense counsel during the discovery process. However, from the entire record in this case, including the supplemented record, the trial court's findings of fact are supported by a record sufficient to withstand attack under the appropriate "manifestly wrong/clearly erroneous" standard of review. *Miss. Dep't. of Transp. v. Johnson*, 873 So.2d 108, 111 (Miss. 2004); *Vaughn v. Vaughn*, 798 So.2d 431, 433-34 (Miss. 2001). *See also Sturdivant v. State*, 745 So.2d 240, 243-44 (Miss. 1999).

Hathorn, the trial court finding on this issue is supported by the record. *See* ***Todd v. State***, 806 So.2d at 1092. Therefore, we find all exculpatory issues raised by Manning regarding Frank Parker and Paula Hathorn to be without merit.[3]

### II. Polygraph Evidence

¶22. Earl Jordan, a convicted burglar, was in jail at the same time as Manning. Jordan had given statements to the police implicating two other men in the murders of Tiffany and Jon. Investigators later ruled out the possibility that the others were involved in the crime. Jordan then told the authorities that Manning had confessed to murdering the students. The State offered Jordan's testimony at trial. On cross-examination, Jordan admitted he had previously implicated others for the same crime and that he was hoping for favorable treatment from the State on his pending charges. The cross-examination also highlighted some discrepancies in Jordan's testimony and the facts surrounding the crime. Then during the re-direct examination, the prosecutor asked Jordan whether he volunteered to take a polygraph on the information that he provided in this statement, and Jordan answered affirmatively.

---

[3]Manning cites the United States Supreme Court's opinion in ***Banks v. Dretke***, 540 U.S. 668, 698 (2004) as the controlling authority. ***Banks*** held that a witness's status as an informant was "unquestionably relevant," and "beyond doubt" disclosure of a witness's informant status would have been beneficial for the jury. ***Banks***, 540 U.S. at 698-701. However, Manning must still prove the three elements of a ***Brady*** violation. *See* ***Brady v. Maryland***, 373 U.S. 83 (1963). Although Paula Hathorn's status as an informant who received consideration for her testimony is relevant, Manning has failed to prove that the State suppressed such evidence either wilfully or inadvertently and that prejudice ensued. Therefore, this issue is without merit.

[The prosecution on re-direct] Now you were questioned at length about your motives, you were questioned at length about the substance of what you testified to. Mr. Jordan, didn't you volunteer to take a lie detector test on this?

¶23. The defense objected, and the trial court initially sustained that objection. Moments later the trial court reversed its decision, allowing the State to question Jordan about his volunteering to take the polygraph.

[The prosecution after the objection was overruled]: Mr. Jordan, did you volunteer or agree to take ⋯ a lie detector test?
A: Yes, I did.

The trial court then refused to allow defense counsel to conduct a re-cross-examination of Jordan concerning his statement about the lie detector test.

¶24. On Manning's direct appeal, this Court found no error in the prosecutor's questions about the polygraph and held that the questioning was proper because the State made no attempt to disclose whether Jordan had actually taken the polygraph or the results of the test. *Manning v. State*, 726 So.2d at 1179. This decision was based on *Conner v. State*, 632 So.2d 1239, 1257-58 (Miss. 1993), in which we held the trial court did not abuse its discretion when it allowed testimony concerning the willingness of a witness for the State to take a polygraph test in order to rehabilitate that witness' testimony. With respect to the polygraph test, Manning now argues he is entitled to a new trial on three bases.

¶25. First, Manning argues this Court has reversed its course since his direct appeal and has now held that questioning a witness about his or her willingness to take a polygraph is improper. *Weatherspoon v. State*, 732 So.2d 158 (Miss. 1999). In *Weatherspoon*, the defendant wanted to testify that he had volunteered to take a polygraph test. The trial court

12

refused to allow that testimony, and this Court affirmed noting that "it should be made clear that any evidence pertaining to a witness's offer to take a polygraph, refusal to take a polygraph test, the fact that a witness took a polygraph test or the results of a polygraph test is inadmissible at trial by the State or by the defense." *Id.* at 163. In *Weatherspoon*, this Court specifically noted Manning's case:

> Recently, in *Manning v. State*, 726 So.2d 1152 (Miss. 1998), relying on the *Conner* decision, this Court held that the testimony of State's witness Earl Jordan that he had volunteered to take a polygraph examination "was proper redirect after Jordan's credibility had been attacked on cross-examination by the defense." *Manning*, 726 So.2d at 1179. Upon careful consideration and further review, we find that testimony pertaining to a witness's offer to take a polygraph, whether it be a witness for the State or the defense, is not admissible at trial. To the extent that this holding affects *Conner v. State*, *Lester v. State*[, 692 So.2d 755 (Miss. 1997)], and *Manning v. State*, cited supra, those cases are overruled.

732 So.2d at 162.

¶26. Second, Manning argues that because he was not allowed to cross-examine Jordan after the reference was made to the polygraph test, and because there was no mention of the polygraph made in the mandatory discovery, he had no opportunity to rebut this evidence.

¶27. Finally, Manning argues he was denied his full right to discovery about whether Jordan took a polygraph and the results of such test. He contends he was unaware of a polygraph examination until the information was first elicited by the State on the re-direct examination of Jordan. Manning asserts that because of a lack of notice and discovery, he does not know whether a polygraph examination was actually administered to Jordan and, if so, the results of such an examination. Manning argues that while the prosecution knew that the results of such an examination would be inadmissible, the prosecution used the question about Jordan's

13

willingness to take a polygraph examination as a way of knowingly creating a false impression of the evidence for the jury.

¶28. With respect to the discovery issue on the polygraph examination, Manning cites to cases by the U.S. Supreme Court holding the State's knowing use of such evidence, or its failure to correct false testimony or its presentation of evidence which creates a materially false impression of the evidence, violates the defendant's right to due process. *Miller v. Pate*, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967); *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Alcorta v. Texas*, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957); *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935).

¶29. At the time of Manning's trial, *Conner v. State*, 632 So. 2d 1239 (Miss. 1993), was the precedent of this Court regarding the admissibility of polygraph testimony. In *Conner*, the prosecution made two references to the polygraph: first, during the direct examination of its star witness, Detective James Brown, and second, during closing arguments. In *Conner*, we discussed this Court's history in addressing polygraph evidence:

> This Court has often held that neither the results of a lie detector test nor the fact that one was taken is admissible as evidence, and that the introduction of such evidence constitutes reversible error. *See Pennington v. State*, 437 So.2d 37, 40 (Miss. 1983); *Jordan v. State*, 365 So.2d 1198 (Miss. 1978), cert. denied, 444 U.S. 885, 100 S.Ct. 175, 62 L.Ed.2d 114 (1979); *Mattox v. State*, 240 Miss. 544, 128 So.2d 368 (1961). However, where the focus is not on the exam itself but instead on one's willingness or reluctance to submit to a polygraph exam, the Court has arrived at a different conclusion.
>
> In *Stringer v. State*, 454 So.2d 468 (Miss. 1984), cert. denied, 469 U.S. 1230, 105 S.Ct. 1231, 84 L.Ed.2d 368 (1985), we held that

14

the mere mention of the failure to submit to an examination could not be reversible error under the record in this case. It was inconsequential in the case compared with all the other evidence placed before the jury. Further bolstering of this opinion is that *we are not dealing with the attempted introduction of the results of a polygraph examination, only the refusal to take one for whatever reason....*

*Stringer*, 454 So.2d at 474-75; *see also **Garrett v. State***, 549 So.2d 1325, 1330-31 (Miss. 1989) (where document disclosing defendant's willingness to take lie detector test was inadvertently delivered to jury, Court ruled that, under Stringer, no reversible error occurred).

It is of course the rule in virtually all jurisdictions that a witness's unimpeached or unquestioned credibility may not be bolstered by any means, including references to polygraphic evidence. See, e.g., ***Tiner v. State***, 214 Miss. 551, 59 So.2d 287 (1952) (testimony supporting veracity of witness is inadmissible where veracity of witness has not been assailed); ***Sparks v. State***, 820 S.W.2d 924, 929 (Tex.Ct.App. 1991) (prosecution impermissibly bolstered witness's testimony by asking, "Did you agree to take a polygraph examination?" where only purpose of question was to add credence to witness's earlier, unimpeached testimony); ***United States v. Vigliatura***, 878 F.2d 1346, 1349 (11th Cir. 1989) ("a witness's or defendant's willingness to submit to a polygraph examination is inadmissible to prevent bolstering of credibility").

*Id*. at 1257-58 (emphasis in original). However, in ***Conner*** this Court announced a new rule of procedure when it interpreted Miss. R. Evid. 608(b) which stated that once a witness's integrity has been impugned:

[s]pecific instances of the conduct of a witness, for the purpose of ... supporting his credibility, ... may ... in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

15

*Id.* at 1259. We determined that the second exception applied to Conner's case. The defense had attacked the State's witness regarding his credibility. Therefore, the State in an attempt to rehabilitate this witness, questioned the detective regarding the witness's agreement to take a polygraph exam. We held that:

> Although this Court has never explicitly held that references to polygraph tests are admissible when used to rehabilitate an impeached witness, the Court did find in *Pittman v. State*, 236 Miss. 592, 111 So.2d 415 (1959), that a reference to such a test on redirect examination, where the results of the test were not disclosed, did not amount to reversible error. *See Pittman*, 236 Miss. at 597-98, 111 So.2d at 417. In light of *Stringer*, *Pittman*, and M.R.E. Rule 608, we find that the trial court did not abuse its discretion by permitting the prosecution to introduce evidence concerning Earnest Stevens' agreement to take a lie detector test.

*Conner*, 632 So.2d at 1259. Therefore, at the time of Manning's 1994 trial, the trial court properly followed this Court's precedent in allowing the State to attempt to rehabilitate a witness by questioning him regarding his agreement to take a polygraph test, and we upheld the trial court's action on direct appeal. *Manning*, 726 So.2d at 1179.

¶30. In 1999, five years after Manning's trial, this Court handed down *Weatherspoon* which overruled *Conner* and the previous *Manning* decision. In *Weatherspoon*, during a bench conference, defense counsel informed the trial court that he was going to ask the defendant to testify to the fact that he offered to take a polygraph test. The State objected, and the trial court sustained the objection, finding the proffered testimony would not be proper evidence. 732 So. 2d at 162. We agreed with the trial court and held that testimony concerning a

16

witness's offer to take a polygraph test was not inadmissible, and that this prohibition applied to witnesses for the prosecution and for the defense.

¶31. Therefore, today's question before this Court, is whether *Weatherspoon* may be applied retroactively. Manning's direct appeal is final, and this case is before us on a motion for post-conviction relief. In *Nixon v. State*, 641 So. 2d 751 (Miss. 1994), this Court was faced with a similar situation. Nixon was convicted of capital murder and was sentenced to death. His conviction and sentence were affirmed on direct appeal. Nixon then filed a petition for post-conviction relief on the grounds that the intervening decision of *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), applied retroactively. We disagreed and denied his petition.

¶32. On direct appeal, Nixon argued that the State's discriminatory use of peremptory challenges violated his constitutional rights. *Nixon*, 641 So. 2d at 753. We concluded that because Nixon was white, he could not object to the exclusion of black jurors. *Id.* However, in *Powers*, the United States Supreme Court held that "a criminal defendant could object to a prosecutor's discriminatory use of peremptory challenges even though the defendant's race was different from the race of the challenged juror." *Powers*, 499 U.S. at 410, 111 S.Ct. at 1370. Therefore, on motion for PCR, Nixon argued that this presented a new rule of federal constitutional law which applied retroactively. *Nixon*, 641 So.2d at 753. Thus, this Court had to decide whether Nixon was procedurally barred from raising this issue or whether this decision could be applied retroactively.

17

¶33.   In *Teague v. Lane*, 489 U.S. 288, 311, 109 S.Ct. 1060, 103 L.Ed.2d 334, 356 (1989), the United States Supreme Court held, by a plurality vote[4] that "a new rule of constitutional law will not be applied retroactively to a case on *habeas* review unless it falls within one of two limited exceptions."   "The first exception suggested by Justice Harlan--that a new rule should be applied retroactively if it places 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe,'" (Citing *Mackey v. United States*, 401 U.S. 667, 692, 91 S.Ct. 1160, 1180, 28 L.Ed.2d 404 (1971).   The second exception is "reserved for watershed rules of criminal procedure."   *Teague*, 489 U.S. at 311.   In approving this plurality decision, the United States Supreme Court later held that:

> The principle announced in *Teague* serves to ensure that gradual developments in the law over which reasonable jurists may disagree are not later used to upset the finality of state convictions valid when entered. This is but a recognition that the purpose of federal *habeas corpus* is to ensure that state convictions comply with the federal law in existence at the time the conviction became final, and not to provide a mechanism for the continuing reexamination of final judgments based upon later emerging legal doctrine.

*Sawyer*, 497 U.S. at 234.   Finding this rationale was consistent with the Mississippi Uniform Post-Conviction Collateral Relief ("PCR") Act, this Court stated that:

> Accordingly, in determining whether a prisoner may avail himself of an intervening decision, this Court applies our PCR act to determine whether an issue raised on PCR is one warranting relief from waiver based on cause and actual prejudice, as contemplated by § 99-39-21(1), or one not procedurally barred, although litigated at trial and on direct appeal, because of the existence of cause and actual prejudice, as contemplated by § 99-39-21(2).   Application

---

[4]The plurality's decision was approved by the majority in *Sawyer v. Smith*, 497 U.S. 227, 110 S.Ct 2822, 111 L.Ed.2d 193 (1990).

18

of this test is based on state law grounds. *See* Miss. Code Ann. §§ 99-39-3, 99-39-21(1), and 99-39-21(2) (Supp. 1993).

*Nixon*, 641 So.2d at 754-55 (footnotes omitted). As to the cause element of the PCR Act, we found that *Powers* did create a new rule of law and that prior to the new rule, there was no indication that *Batson* would be changed; therefore, the showing of cause had been met by the intervening decision. *Nixon*, 641 So. 2d at 755. We relied heavily on *Teague* in determining if there was a showing of actual prejudice. We determined that pursuant to *Teague* the defendant would have to show actual prejudice within one of the two exceptions enumerated by the Supreme Court.

> The first *Teague* exception is not met in this case because "[a]pplication of the fair cross section requirement to the petit jury would not accord constitutional protection to any primary activity whatsoever." *Accord Teague*, 489 U.S. at 311, 109 S.Ct. at 1075-76, 103 L.Ed.2d at 356. Stated differently, the new rule does not place a category of primary conduct beyond the reach of the criminal law nor does it prohibit punishment for a class of defendants. *Teague*, 489 U.S. at 311, 109 S.Ct. at 1075-76, 103 L.Ed.2d at 356. The second *Teague* exception affords Nixon no comfort because it is limited to those new procedures without which the likelihood of an accurate conviction is seriously diminished. Restated, "absence of a fair cross section on the jury venire does not undermine the fundamental fairness that must underlie a conviction or seriously diminish the likelihood of obtaining an accurate conviction." *Id*. at 315, 109 S.Ct. at 1078, 103 L.Ed.2d at 359. The *Teague* Court concluded that "a rule requiring that petit juries be composed of a fair cross section of the community would not be a 'bedrock procedural element' that would be retroactively applied under the second exception." *Teague*, 489 U.S. at 315, 109 S.Ct. at 1078, 103 L.Ed.2d at 359.

*Nixon*, 641 So.2d at 755. Therefore, we held that because there was no actual prejudice suffered by Nixon, he was not entitled to relief pursuant to the Act. *Id.* Further, we held that "the *Powers* decision should not be applied retroactively to Nixon's final conviction as the

19

*Powers* rule is not a prerequisite to fundamental fairness of the type that may come within the exception." *Id.*

¶34.    The United States Supreme Court has once again addressed this issue. In *Schriro v. Summerlin*, 542 U.S.348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004), the Supreme Court held that the decision in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d. 556 (2002), was procedural and did not apply to death penalty cases already final on direct appeal, nor did it announce a watershed rule of criminal procedure.   Therefore, the Ninth Circuit's invalidation of the defendant's death sentence was reversed.

¶35.    In *Schriro*, the Supreme Court stated:

> When a decision of this Court results in a "new rule," that rule applies to all criminal cases still pending on direct review. *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).   As to convictions that are already final, however, the rule applies only in limited circumstances.   New *substantive* rules generally apply retroactively.   This includes decisions that narrow the scope of a criminal statute by interpreting its terms, see *Bousley v. United States*, 523 U.S. 614, 620-621, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998), as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish, see *Saffle v. Parks*, 494 U.S. 484, 494-495, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990); *Teague v. Lane*, 489 U.S. 288, 311, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion).   Such rules apply retroactively because they "necessarily carry a significant risk that a defendant stands convicted of 'an act that the law does not make criminal'" or faces a punishment that the law cannot impose upon him.   *Bousley*, *supra*, at 620, 118 S.Ct. 1604 (quoting *Davis v. United States*, 417 U.S. 333, 346, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974)).
>
> New rules of procedure, on the other hand, generally do not apply retroactively. They do not produce a class of persons convicted of conduct the law does not make criminal, but merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise.   Because of this more speculative connection to innocence, we give retroactive effect to

only a small set of "'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Saffle*, supra, at 495, 110 S.Ct. 1257 (quoting *Teague*, 489 U.S., at 311, 109 S.Ct. 1060). That a new procedural rule is "fundamental" in some abstract sense is not enough; the rule must be one "without which the likelihood of an accurate conviction is *seriously* diminished." *Id.*, at 313, 109 S.Ct. 1060 (emphasis added). This class of rules is extremely narrow, and "it is unlikely that any ... 'ha[s] yet to emerge.'" *Tyler v. Cain*, 533 U.S. 656, 667, n. 7, 121 S.Ct. 2478, 150 L.Ed.2d 632 (2001) (quoting *Sawyer v. Smith*, 497 U.S. 227, 243, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990)).

*Schriro*, 124 S.Ct. at 2522-23.

¶36.   A rule is procedural if that rule "regulates the manner of determining the defendant's culpability." *Id*. at 2523. However, a rule is substantive if that rule "alters the range of conduct or the class of persons that the law punishes." *Id.* Because *Ring* held that "a sentencing judge, sitting without a jury, [may not] find an aggravating circumstance necessary for imposition of the death penalty," *Ring's* holding is classified as procedural. *Ring*, 536 U.S. at 609. "*Ring* altered the range of permissible methods for determining whether a defendant's conduct is punishable by death, requiring that a jury rather than a judge find the essential facts bearing on punishment.   Rules that allocate decisionmaking authority in this fashion are prototypical procedural rules. . . ." *Schriro*, 124 S.Ct. at 2523.

¶37.   As to the watershed requirement, the Supreme Court found the "evidence [was] simply too equivocal to support the conclusion" that "judicial factfinding so '*seriously* diminishe[s]' accuracy that there is an 'impermissibly large risk' of punishing conduct the law does not reach." *Id.* at 2525.   Therefore, the Supreme Court held that "*Ring* announced a new procedural rule which did not retroactively apply to cases already final on direct review." *Id.*

21

at 2526. Applying the rules found in *Teague*, *Schriro* and *Nixon*, we find that *Weatherspoon* announced a procedural rule which does not retroactively apply to cases already final on direct review.

¶38. As in *Nixon*, *Weatherspoon* did create a new rule of law, finding that polygraph test evidence was not admissible. During Manning's trial, the State was allowed on re-direct examination to question its witness, Earl Jordan, as to whether he volunteered to take a polygraph exam. This was the only time this test was mentioned by the State. However, Manning, through counsel, got before the jury on three different occasions that one of Manning's witnesses, Carl Rambus, had agreed to take a polygraph examination. Rambus had testified that Manning was not the person who had attempted to sell him the ring (identified as Jon's high school class ring). On re-direct examination by defense counsel, Rambus stated he had agreed to take a polygraph examination. During defense counsel's cross-examination, Detective David Lindley testified that Rambus had agreed to take a polygraph examination. During defense counsel's cross-examination, Sheriff Dolph Bryan testified that Rambus had agreed to take a polygraph examination. During defense counsel's cross-examination, Detective Gary Turner could not confirm that Rambus had agreed to take a polygraph examination. During the closing argument to the jury, defense counsel argued, inter alia:

> You heard Carl Rambus or heard the sheriff and the deputy, the detective, David Lindley, all testify Carl Rambus agreed to take a polygraph.

Thus, the jury heard Manning's counsel make references on five different occasions that Manning's witness, Carl Rambus, had offered to take a polygraph examination.

22

¶39. Without question, *Weatherspoon* created a new rule of law concerning the admissibility of polygraph evidence, or references to polygraph examinations, and prior to the new rule, there was no indication that our rule as pronounced in *Conner* would be changed. Thus, the element of cause was met by the intervening decision.

¶40. As to actual prejudice, neither of the two elements enumerated in *Teague* are met. First, "the new rule does not place a category of primary conduct beyond the reach of the criminal law nor does it prohibit punishment for a class of defendants." 489 U.S. at 311. Second, this procedural rule does not diminish the likelihood of an accurate conviction. *Id*. at 315. Because no actual prejudice is suffered by Manning, *Weatherspoon* affords him no relief.

¶41. Because *Weatherspoon* was a procedural rule and it did not announce a watershed rule of criminal procedure, its holding may not be retroactively applied to Manning's case which was final on direct review. Therefore, this issue is without merit.

¶42. Furthermore, we take this opportunity to expressly state that in the future this Court will continue to apply the very limited retroactive application standard set forth by the United States Supreme Court in *Teague v. Lane*. In previous opinions this Court has failed to apply the *Teague* decision and instead continued to adhere to a more liberal position that "judicially enunciated rules of law are applied retroactively." *See Kolberg v. State*, 704 So.2d 1307, 1316 (Miss. 1997) (quoting *Ales v. Ales*, 650 So.2d 482, 484 (Miss. 1995)); *see also Morgan v. State*, 703 So.2d 832, 839 (Miss. 1997); *Cain v. McKinnon*, 552 So.2d 91, 92 (Miss.

23

1989); ***Hall v. Hilburn***, 466 So.2d 856, 875 (Miss. 1985); ***Keyes v. Guy Bailey Homes, Inc***., 439 So.2d 670, 672-73 (Miss. 1983). We hold today that the limited retroactive standard set forth in the United States Supreme Court case of ***Teague v. Lane*** should be applied to all issues relating to the retroactive application of judicially enunciated rules.

### III. Ineffective Assistance of Counsel

¶43. "The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." ***Strickland v. Washington***, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A claimant must demonstrate that counsel's performance was deficient and that the deficiency prejudiced the defense of the case. ***Id.*** at 687. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." ***Stringer v. State***, 454 So.2d 468, 477 (Miss. 1984) (citing ***Strickland***, 466 U.S. at 687). The focus of the inquiry is on whether counsel's assistance was reasonable considering all the circumstances. ***Id.*** A reviewing court must strongly presume that counsel's conduct falls within a wide range of reasonable professional assistance. Further, one who claims ineffective assistance must overcome another presumption: that the challenged act or omission "might be considered sound trial strategy." ***Id.*** at 477. In other words, defense counsel is presumed competent. ***Strickland***, 466 U.S. at 690.

¶44. As for the second prong of prejudice to the defense, a reviewing court must determine whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mohr v. State*, 584 So.2d 426, 430 (Miss. 1991). This means a "probability sufficient to undermine the confidence in the outcome." *Id.*

¶45. In a death penalty case, the ultimate inquiry is "whether there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. There is no constitutional right to errorless counsel. *Mohr*, 584 So.2d at 430. The right to effective counsel does not entitle a defendant to have an attorney who makes no mistakes at trial but simply affords the right to have competent counsel. If the post-conviction application fails on either of the *Strickland* prongs, the analysis of that issue ends. *Davis v. State*, 743 So.2d 326, 334 (Miss. 1999) (citing *Foster v. State*, 687 So.2d 1124, 1130 (Miss. 1996)). We thus proceed to address the claims of ineffective assistance of counsel as to: (A) impeachment of Earl Jordan and Frank Parker; (B) the testimony of Paula Hathorn; and © defense counsel's failure to present an alibi defense and mitigating evidence and failure to preserve issues for appeal.

### A. Failure to impeach Earl Jordan and failure to adequately develop evidence to impeach Frank Parker.

¶46. Manning argues his defense counsel was ineffective for failing to properly impeach Earl Jordan and failing to cross-examine Jordan about certain details of his testimony and any deal

that may have been struck with the State in exchange for the testimony. Likewise, Manning asserts his trial counsel was ineffective for failing to exercise due diligence in failing to uncover evidence to impeach Frank Parker, another jailhouse informant. Manning argues that failure to follow-up for purposes of impeachment, failure to lay a proper foundation to rebut the testimony of the State's star witness, failure to follow well-established evidentiary rules and missed opportunities to impeach Jordan as a credible witness, meet the ***Strickland*** standard of ineffective assistance of counsel.

¶47. The State asserts Manning's ineffective assistance of counsel claim as to Jordan's testimony was addressed on direct appeal and cannot be relitigated in post-conviction proceedings. Furthermore, the State argues Manning's claim of ineffective assistance of counsel as to Parker's testimony is procedurally barred for failure to raise it on direct appeal, noting that several other claims of ineffective assistance were raised on direct appeal and that this one should have been included. Lastly, the State argues Manning's claim that his counsel failed to adequately impeach Frank Parker is absolutely refuted by the trial transcript.

¶48. The State is correct. On direct appeal, we found that Jordan was thoroughly cross-examined and that there was other evidence before the jury that Jordan was hoping for a favorable deal in exchange for his testimony. The transcript indicates that defense counsel cross-examined Jordan and attempted to discredit his testimony. Manning's defense counsel's performance was not deficient merely because he did not conduct the cross-examination of Jordan in every regard as post-conviction counsel asserts he should have done. Post-conviction counsel has the benefit of hindsight. *See **Bell v. Cone***, 535 U.S. 685, 702,

26

122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Kimmelman v. Morrison*, 477 U.S. 365, 382, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986); *United States v. Cronic*, 466 U.S. 648, 656, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

¶49.    Notwithstanding the procedural bar, as to the testimony of Frank Parker, the transcripts reveal that defense counsel conducted a thorough cross-examination of Parker, including that criminal charges against him in Texas were dropped after he came forward with information in Manning's case.   Defense counsel also pursued a line of questioning attempting to call into doubt whether Parker could really have overheard the conversation in which Manning stated that he sold the gun(s) on the street.   We find these claims fail to meet the *Strickland* test and are without merit.

### B. Testimony of Paula Hathorn.

¶50.    Manning argues defense counsel, Mark G. Williamson, had a conflict of interest because he had previously represented Paula Hathorn, one of the State's key witnesses, on bad check charges.    Manning also asserts the trial judge was on notice of the conflict and committed error when he did not conduct a thorough inquiry into any possibility of a conflict. *See Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).   If the trial judge has a reasonable basis to believe that defense counsel faces an actual conflict, the judge must conduct a hearing.   The failure to do so mandates reversal.   *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978).   Manning asserts that "an actual conflict exists when defense counsel is compelled to compromise his or her duty of loyalty or zealous

27

advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client." ***Perillo v. Johnson***, 205 F.3d 775, 781 (5th Cir. 2000). This conflict, Manning argues, had an adverse effect on his defense because his attorney had no real opportunity to rebut or refute any of the false testimony Hathorn provided, and her false testimony undermined the credibility of Manning's defense.

¶51. The State succinctly argues this claim was raised on direct appeal and cannot be relitigated on post-conviction review. *See* Miss. Code Ann. § 99-39-21(3); ***Wiley v. State***, 750 So.2d 1193, 1200 (Miss. 1999); ***Foster v. State***, 687 So.2d 1124, 1135-37 (Miss. 1996). The allegations that the State presented evidence that created a false impression and withheld information from the defense is all supported in Manning's post-conviction relief application by an affidavit of Hathorn given during a recent incarceration and vaguely expressed, years after the trial.

¶52. In Manning's case, Hathorn was merely a witness, not a party to this action, and Williamson's representation was completely unrelated to the events and charges of the Manning case. There was no reasonable basis for the judge to conduct a hearing as to any conflict. On direct appeal, we found that defense counsel conducted a full cross-examination of Hathorn, and there is no reasonable probability that the result of the trial would have been different if the jury had never known that defense counsel had represented Hathorn in the past. ***Manning***, 726 So.2d at 1169. Furthermore, on direct appeal, this Court held that defense counsel had no conflict in his representation of Manning. ***Id.*** This issue has been litigated and

is barred as a basis for post-conviction relief, and alternatively, upon consideration, it is also without merit.

¶53. Also related to Hathorn's trial testimony, Manning alternatively asserts his trial counsel was ineffective for not adequately impeaching Hathorn. Manning claims his attorney failed to take steps to establish the falsity of her testimony about his representation of her and he failed to impeach her with the vast number of bad checks that she had written since she first began giving statements to the sheriff. Manning argues such impeachment would have shown Hathorn's willingness to lie because of her anger and would have revealed Hathorn's false testimony about Williamson's representation of her, the magnitude of Hathorn's criminal history, and the subsequent lenient treatment Hathorn received on her pending charges.

¶54. The State again argues res judicata and procedural bar to this claim. The State also asserts that the charges of trial counsel's ineffectiveness are refuted by the trial transcripts and an on-point review of those issues on direct appeal.

¶55. This issue was litigated on direct appeal, and this Court found Manning's trial court representation to be effective. The Court noted that "the record indicates that Williamson conducted a full cross-examination of Hathorn." *Id*. We find this issue is procedurally barred, and additionally, it is without merit. Defense counsel conducted a full cross-examination of Hathorn, and while Hathorn did make comments as to defense counsel's past representation of her, it was not in such a way to prejudice Manning's defense or to cause counsel to be ineffective.

¶56. In his motion to amend and proposed amendment to his PCR motion, as well as his objections to the trial court's evidentiary hearing order, Manning asserts that if we should accept the trial court's findings of fact, the court-ordered evidentiary hearing conducted by the trial court revealed ineffective assistance of trial counsel when he either overlooked the micro-cassette tapes and partial transcripts of the telephonic conversations between Hathorn and Manning, or having seen this evidence, failed to attach any significance to them so as to use this evidence for impeachment of Hathorn. Additionally, Manning asserts the evidentiary hearing revealed there was other evidence which Sheriff Dolph Bryan offered for examination which defense counsel simply failed to review. First, we find this argument is procedurally barred; however, procedural bar notwithstanding, we discuss this additional claim and deny it on its merits. As discussed, *supra*, concerning Issue I as to "Exculpatory Evidence," the trial court appropriately found on remand that inasmuch as these telephonic conversations were "scripted" by law enforcement by getting Hathorn to ask particular questions of Manning in an effort to prompt incriminating statements from him, the taped conversations had little if any impeachment value. The record in today's case clearly reveals the existence of an enormous amount of evidence. We refuse to find ineffective assistance of counsel based on a perceived or claimed failure to examine every piece of evidence in every box. Thus, this issue is without merit.[5]

---

[5]As already noted, Manning has likewise filed a 26-page objection to the circuit court's entry of its "Evidentiary Hearing Order," which order was entered subsequent to the trial court's conducting an evidentiary hearing pursuant to this Court's order. In essence, through this written objection, Manning requests that we "reject" this order. This we refuse to do, and

### *C. Alibi Defense.*

¶57. Trial counsel produced several witnesses that placed Manning at a nightclub on the night of the murders. However, two of those witnesses were only able to testify that they saw Manning around 11:30 or 12:00. The testimony of Manning's other witnesses was impeached and criticized by the State as being unreliable. Manning asserts that if trial counsel had conducted a more thorough investigation he could have presented a substantially stronger case. Post-conviction counsel includes the affidavits of Sherron Armstead Mitchell, Doug Miller and Troylin Jones. The recollections of these witnesses place Manning at the nightclub well after midnight, and one of the witnesses' statements placed Manning at the nightclub at the very hour the murders were taking place. Manning argues he was prejudiced by counsel's failure to develop more substantial evidence in support of his alibi and notes that reviewing courts have found counsel ineffective for inadequately presenting an alibi defense. *See **Grier v. State***, 299 S.C. 321, 384 S.E.2d 722 (1989).

¶58. We find Manning fails to establish that his trial counsel's performance was deficient where counsel produced several witnesses placing Manning at a nightclub on the night of the murder.

---

the objection is thus denied as reflected by an order this day entered.

### D. Preservation of issues for direct appeal.

¶59.    Manning argues  trial counsel failed to preserve several issues, including his assertion that the prosecutor violated *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), in striking blacks from the jury pool where his reasons were pretextual. Likewise, Manning argues trial counsel's performance was deficient for failing to object when Hathorn testified to Manning's prior bad acts and character.   Manning also argues defense counsel promised, in his opening statement, to produce testimony that someone else had confessed to the crime.   When the defense counsel did not follow through by presenting this testimony, the prosecutor noted it in his closing argument.    Thus, according to Manning, the defense attorney's unkept promise of such testimony was detrimental to his defense.   Finally, Manning asserts defense counsel was ineffective for failing to object when the prosecutor referred to Manning as a "monster" and likened the case to the O.J. Simpson case.

¶60.    The State argues Manning is wrong to assert that defense counsel did not preserve *Batson* claims.   The defense attorney did raise a claim under *Batson*, and the trial court required the State to give race-neutral reasons for its peremptory challenges.   Those reasons were then reviewed by this Court on appeal.  *Manning*, 726 So.2d at 1183-86.  Next, the State argues Manning's claim that defense counsel was ineffective for failing to object to Hathorn's testimony cannot be sustained where the underlying substantive issue was raised on direct appeal and decided against Manning.

¶61.    The State correctly points out that the issue of Hathorn's testimony and whether or not trial counsel was ineffective was litigated on direct appeal, and is now procedurally barred.   As

32

for the merits of this claim, we find Manning's claims do not rise to the level of *Strickland*, and we thus, alternatively, deny this issue on its merits.

### E. Mitigation Evidence.

¶62.    Manning asserts trial counsel had a duty to uncover all relevant mitigating evidence and to conduct a thorough investigation into possible mitigating evidence.    The record indicates there were witnesses who had knowledge of Manning's family and were willing to cooperate with defense counsel.    Specifically, there are letters in the file from Mark Williamson (defense counsel) to Richard Burdine (co-counsel) suggesting witnesses for the mitigation portion of the penalty phase of trial.    Those witnesses were apparently never contacted. Furthermore, Manning includes affidavits from an attorney in Louisiana and an investigator which declare the existence of valuable mitigating evidence that was never presented at trial. Failing to present such evidence, Manning argues, is proof of his trial counsel's deficient performance and satisfies both prongs of *Strickland*.

¶63.    The "failure to present a case in mitigation during the sentencing phase of a capital trial is not, per se, ineffective assistance of counsel." *Williams v. State*, 722 So.2d 447, 450 (Miss. 1998) (citing *Williams v. Cain*, 125 F.3d 269, 277 (5th Cir. 1997)).    In the present case, Manning's defense attorney did present a case in mitigation for the jury to consider. Furthermore, this claim was raised on direct appeal, and the Court found Manning failed to show prejudice related to trial counsel's failure to call other witnesses.    Likewise, the Court noted that "additional character witnesses would not have, with any reasonable probability

tipped the balance between mitigators and aggravators." **Manning**, 726 So.2d at 1170. This claim is procedurally barred because this Court has already addressed its merits; however, alternatively, we find this issue to also be without merit.

### F. Closing argument.

¶64. Manning argues that because of the lack of investigation and preparation for the penalty phase of trial, defense counsel had nothing substantial to present in his closing argument. Manning argues defense counsel, therefore, presented a powerless and incoherent closing argument which resulted in prejudice to his defense. Thus, it is Manning's position this satisfies both prongs of **Strickland** and warrants post-conviction relief.

¶65. On direct appeal, this Court found that trial counsel's closing argument was coherent and not a poor strategic choice. We noted: "[i]t is the opinion of this Court that Burdine's performance was not deficient." **Id.** at 1171. Because we addressed this issue on direct appeal, we now find this issue procedurally barred; however, alternatively, we again reiterate it is without merit.

### G. Failure to object.

¶66. Manning argues the prosecutor's remark during the State's closing argument that God sanctions, even commands, imposition of the death penalty for murder and that Manning was "a vessel of wrath fit only for destruction" improperly elaborated on religious themes and violated his constitutional right to a reliable determination of his sentence. He also asserts the prosecutor made improper and prejudicial references to what Manning might do if he were

paroled. Furthermore, Manning argues his trial counsel was ineffective for failing to object to these remarks and preserve the issues for appeal.

¶67. The State counters the claim was not raised on direct appeal and is therefore barred. Without waiving the bar, the State argues this Court has held that arguments with scriptural, religious or biblical references are proper when made in response to scriptural or religious arguments by defense counsel. Looking to the transcript, it is clear that the prosecutor was responding to those type of "vengeance is mine" arguments set out by the defense.

¶68. We agree this claim is barred for failure to raise it on direct appeal. Notwithstanding the procedural bar, we find this claim has no merit because this Court has found Biblical or scriptural references in closing arguments to be within the broad latitude afforded at trial.

> This Court has continually held that counsel is afforded broad latitude in closing argument. This latitude, set out by the Court in ***Nelms & Blum Co. v. Fink***, 159 Miss. 372, 382-383, 131 So. 817, 820 (1930), has been referred to in the context of capital cases. In ***Nelms***, we stated that "[c]ounsel may draw upon literature, history, science, religion, and philosophy for material for his argument." ***Id.*** at 382-384, 131 So. 817. *See **Hansen v. State***, 592 So.2d 114, 139-140 (Miss. 1991) [other citations omitted].

***Berry v. State***, 703 So.2d 269, 281 (Miss. 1997) (quoting ***Carr v. State***, 655 So. 2d 824, 853 (Miss. 1995)). Considering the merits of this issue, Manning fails to demonstrate prejudice regarding the State's scriptural references or parole argument during closing argument of the sentencing phase of Manning's trial. We thus find this issue to be without merit.

**IV. Cumulative Error**

¶69.    Manning asserts the familiar argument that even if we should find no individual reversible error, we should still afford him relief because of the cumulative effect of certain errors committed during the course of this trial.   In *Byrom v. State*, 863 So.2d 836, 846-47 (Miss. 2003), we took the opportunity to clarify our position on the "cumulative effect" argument, conceding the existence of less than clear language in prior cases.  *See, e.g.*, *Jenkins v. State*, 607 So.2d 1171, 1183-84 (Miss. 1992); *McFee v. State*, 511 So.2d 130, 136 (Miss. 1987).  In *Byrom*, we stated:

> What we wish to clarify here today is that upon appellate review of cases in which we find harmless error or any error which is not specifically found to be reversible in and of itself, we shall have the discretion to determine, on a case-by-case basis, as to whether such error or errors, although not reversible when standing alone, may when considered cumulatively require reversal because of the resulting cumulative prejudicial effect. That having been said, for the reasons herein stated, we find that errors as may appear in the record before us in today's case, are individually harmless beyond a reasonable doubt, and when taken cumulatively, the effect of all errors committed during the trial did not deprive Michelle Byrom of a fundamentally fair and impartial trial. We thus affirm Byrom's conviction and sentence.

863 So.2d at 847.   Consistent with our pronouncement in *Byrom*, we find from the record before us in today's case that any trial court errors were harmless, and when considering the cumulative effect of these harmless errors, there exists no cumulative prejudicial effect requiring reversal.  Therefore, we find this assignment of error to be without merit.

36

## CONCLUSION

¶70. Accordingly, for the reasons herein stated, we find that Willie Manning is not entitled to seek post-conviction relief; therefore, his post-conviction relief motion is denied.

¶71. **PETITION FOR POST-CONVICTION RELIEF, DENIED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., DICKINSON AND RANDOLPH, JJ., CONCUR. DIAZ, EASLEY AND GRAVES, JJ., NOT PARTICIPATING.**